## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JOSEPH H. SCHNITT, III[1] | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| PAMELA J. BONDI, | * | |
| in her official capacity as Attorney General | * | |
| DEPARTMENT OF JUSTICE | * | Civil Action No: 25-_____ |
| 950 Pennsylvania Avenue, N.W. | * | |
| Washington, D.C. 20530 | * | **JURY TRIAL DEMANDED** |
| | * | |
| and | * | |
| | * | |
| DEPARTMENT OF JUSTICE | * | |
| 950 Pennsylvania Avenue, N.W. | * | |
| Washington, D.C. 20530 | * | |
| | * | |
| and | * | |
| | * | |
| THE UNITED STATES OF AMERICA | * | |
| Washington, D.C. 20500 | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>COMPLAINT</u>

Plaintiff Joseph H. Schnitt, III, ("Mr. Schnitt") served as an exemplary employee of the

United States Government for more than two decades until he was suddenly, arbitrarily and

unlawfully fired on September 5, 2025. At the time of his termination, Mr. Schnitt was working

for the Department of Justice ("DOJ"), specifically serving as the Acting Deputy Chief of the

Special Operations Unit within the Office of Enforcement Operations in the Criminal Division,

---

[1] Pursuant to Local Civil Rule 5.1(c)(1), the Plaintiff's residential address is being filed under
seal with the Court in a separate Notice of Filing.

where, among other matters, he managed the Federal Witness Security Program (what is often known to the public as WITSEC).

Notwithstanding decades of statutory and regulatory provisions that both Congress and the Executive Branch painstakingly crafted and implemented governing how and when members of the civil service can be terminated, and the limitations that apply to such proceedings, Attorney General Pamela Bondi ("Defendant AG Bondi") personally summarily removed Mr. Schnitt from federal service through issuance of a one-page memorandum "[p]ursuant to Article II of the United States Constitution and the laws of the United States []." ("Termination Memo"). In so doing, DOJ expressly and deliberately failed to afford Mr. Schnitt the required due process prior to his termination. To make matters worse, DOJ also unlawfully publicly disseminated information retrieved from Mr. Schnitt's Privacy Act Systems of Records without his consent.

This action is being brought against Defendants AG Bondi, in her official capacity, DOJ, and the United States of America (herein referred to collectively as the "Defendants" or "Government") for the purposes of seeking relief under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, the Privacy Act of 1974, 5 U.S.C. § 552a, the All Writs Act, and the First and Fifth Amendments to the Constitution of the United States.

## JURISDICTION AND VENUE

1.   This Court has subject matter jurisdiction over this action pursuant to 5 U.S.C. § 552a(g) and 28 U.S.C. § 1331.

2.   Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and (e), 5 U.S.C. § 552a(g)(5) and § 703.

3.   Sovereign immunity for non-monetary relief is waived under 5 U.S.C. § 702, which entitles Mr. Schnitt to relief when Defendants acted unconstitutionally and beyond statutory authority.

## PARTIES

4.   Mr. Schnitt spent the entirety of his more than 23 years of federal service working for Defendant DOJ and consistently received positive performance evaluations of "Exceeds Expectation" or "Outstanding". He was noted as one of the top performers who handled Special Operations Unit assignments, served as a leader on several important projects, and was a trusted advisor to senior leadership, particularly given he had the longest tenure in his unit which afforded him invaluable insights. In recognition for his service, Mr. Schnitt received several awards, including numerous on-the-spot awards and promotions. He had no previous disciplinary history before his termination.

5.   Defendant AG Bondi is sued in her official capacity as the Attorney General of the United States. She personally signed the Termination Memo that removed Mr. Schnitt from federal service.

6.   Defendant DOJ, which is headquartered in Washington, D.C., is an agency of the United States as defined by 5 U.S.C. § 552a(a)(1) and § 701 and is subject to the jurisdiction of this Court. Defendant DOJ officials or employees terminated Mr. Schnitt and disseminated his privacy protected information without his consent.

7.   Defendant United States of America is responsible for the exercise of state action by the other Defendants and which is being challenged by Mr. Schnitt.

## FACTS

### *The Illicit Recording of Mr. Schnitt*

8.   The entire premise for the Government's termination of Mr. Schnitt's federal employment are remarks he made during what he believed was a private date with a potential romantic partner. No aspect of the Government's stated predicate for removing Mr. Schnitt from federal service was linked to his work performance.

9.   On or about July 14, 2025, Mr. Schnitt met a woman on the social media dating application known as Hinge. This individual, whose name was listed as "Skylar", had a profile with various pictures and said she was open to a short or long-term relationship, and that the "one thing I'd love to know about you" was "what career you are in!".

10. For his part, Mr. Schnitt's public profile on Hinge described his employment only as a "case analyst at government". The profile did not list federal versus state government, and it did not indicate what type of work he did specifically, or even generally.

11.  After connecting on Hinge and exchanging phone numbers, "Skylar" initiated texts with Mr. Schnitt on or about July 14, 2025. They continued to exchange texts and on Saturday, July 26, 2024, "Skylar" asked Mr. Schnitt if he would like to meet in person for dinner the following weekend. They planned to have dinner on Sunday, August 3, 2025, and "Skylar" made the restaurant reservations. Mr. Schnitt, however, had to cancel at the last minute so "Skylar" suggested a lunch date on Monday, August 4, 2025, since they both had the day off, to which Mr. Schnitt agreed. On August 4, 2025, Mr. Schnitt and "Skylar" met at a restaurant in Old Town Alexandria, Virginia. The date lasted approximately 60-90 minutes.

12. Mr. Schnitt and "Skylar" sat at a table outside. While there were others also eating outside, they were not close enough to listen in or hear the substance of Mr. Schnitt and "Skylar's" conversation. There was also a lot of ambient noise. Mr. Schnitt had no reason to

believe anyone else was attempting to listen to their conversation, let alone record it, and he considered the discussion to be a private conversation.

13. During the course of the date, "Sklyar" asked several questions about what Mr. Schnitt knew about Jeffrey Epstein ("Mr. Epstein") and Ghislaine Maxwell ("Ms. Maxwell"). These individuals are literally common household names now. Mr. Epstein infamously died in 2019 while in federal custody awaiting trial on child sex trafficking charges and had previously served approximately thirteen months in prison in 2008 as part of a plea deal involving child prostitution. Prior to his death, Mr. Epstein had reportedly maintained friendships at different times with numerous politically and financially important individuals, including President Donald J. Trump ("Mr. Trump"), former President William J. Clinton ("Mr. Clinton"), and current Secretary of Commerce Howard Lutnick. Ms. Maxwell, for her part, was Mr. Epstein's romantic partner and criminal accomplice over the years. She was indicted and ultimately convicted in 2021 on federal sex trafficking charges. She remains in federal prison where she is serving a 20-year sentence.

14. To the best of his knowledge and recollection, Mr. Schnitt has never been involved in any aspect of the investigations, prosecutions, convictions and/or incarcerations of either Mr. Epstein or Ms. Maxwell. He does not have any personal knowledge regarding the details of those cases as a result of his federal employment. To the best of his knowledge and recollection, Mr. Schnitt has never even learned anything about either matter during the course of his official duties.

15. In any event, by the time of the first "date" with "Skylar", the issue of Mr. Epstein and Ms. Maxwell was prominently and notably in the news due to political and legal debates over the release of the Government's files memorializing its investigation into the activities of Mr. Epstein (the "Epstein Files"), including activities by any other associates beyond Ms. Maxwell.

In addition, while her appeal to the U.S. Supreme Court was still pending, Ms. Maxwell sat for a two-day interview in July 2025, with Deputy Attorney General Todd Blanche, a former personal attorney for Mr. Trump, and shortly thereafter she was relocated to a lower-level security prison where she currently remains. News reports have repeatedly suggested Ms. Maxwell is preparing a request to Mr. Trump for the commutation of her prison sentence. It was also publicly known that Defendant DOJ had been conducting an extensive review of the Epstein Files to identify possible information that could be released to assuage political pressure on Mr. Trump from his vocal social media supporters. *See e.g. https://www.nytimes.com/2025/07/24/us/politics/epstein-files-trump-bondi-justice-department-fbi.html* (last accessed November 20, 2025). Media reporting also widely suggested that Defendant DOJ's personnel who were reviewing the Epstein File had been given instructions to flag any mentions of prominent individuals, such as Mr. Trump, Mr. Clinton, and other notable persons. Id.

16. It was in the context of this swirling media storm that Mr. Schnitt found himself on his date with "Skylar", who was asking questions about the Government's efforts to ultimately release some (or parts) of the Epstein Files to the public, as well as about Ms. Maxwell's transfer to a minimum-security prison. Again, Mr. Schnitt had no personal knowledge regarding the Government's review or processing of the Epstein Files for release to the public or Ms. Maxwell's incarceration status and never at any time indicated that he had such knowledge.

17. Mr. Schnitt was puzzled by the number of questions related to the Epstein Files and Ms. Maxwell that "Skylar" was asking but assumed it was simply because of the current prominence of the topic in the news. After the first "date" they continued to exchange texts messages and on August 11, 2025, "Skylar" asked Mr. Schnitt if he was free the next weekend for a second date. Mr. Schnitt agreed and "Skylar" made a restaurant reservation in Washington,

D.C. for Saturday, August 16, 2025. During the second "date", "Skylar" again brought up questions about the Epstein Files, but Mr. Schnitt had nothing more to say on the subject and steered the conversation to other topics. During one or both of the two dates, Mr. Schnitt informed "Skylar" at least once, if not multiple times, that he had no special knowledge of the case and that anything he knew was mere conjecture and opinion, and based solely on what he had learned from public and social media. He never claimed to have any knowledge based on his being an employee at Defendant DOJ.

18. On August 31, 2025, "Skylar" suggested via text that they have a third date. She followed up again on September 3, 2025, to try to set a time for this date. Mr. Schnitt told her he could not make that date and asked her what she was looking for in terms of any relationship. She never responded and that was the last contact Mr. Schnitt had with "Skylar".

19. Mr. Schnitt later came to learn that "Skylar", whose true name upon information and belief is Dominque Phillips (formerly associated with Turning Point USA, and whose Internet presence has apparently been scrubbed from when her actual identity first became known), was working as an undercover operative for O'Keefe Media Group ("OMG") and James O'Keefe ("Mr. O'Keefe") and that the "date" was a complete set-up. Suffice to say, Mr. O'Keefe's "investigative" methods, during the time he spent with his prior non-profit organization, Project Veritas, and through today, have spawned multiple civil lawsuits, as well as a criminal judgment against him. For particularly relevant background on the behavior and legal issues that pertain to Mr. O'Keefe, *see e.g., Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109 (D.D.C. 2018). *See also AFT Michigan v. Project Veritas*, 397 F. Supp. 3d 981 (E.D. Mich. 2019)(Project Veritas employee allegedly obtained internship at labor union using false identity and credentials and secretly recorded private conversations and accessed confidential documents,

which Project Veritas then published); *Wentz v. Project Veritas*, 2019 U.S. Dist. LEXIS 67899, 2019 WL 1716024 (M.D. Fla. Apr. 16, 2019)(Project Veritas employees secretly recorded conversations with plaintiff in public locations, which were then published); *Vera v. O'Keefe*, 2012 U.S. Dist. LEXIS 112406, 2012 WL 3263930 (S.D. Cal. 2012)(O'Keefe and another individual secretly videotaped and recorded plaintiff at place of work); *Conway-Russell v. O'Keefe*, No. 10-cv-00276 (E.D. Pa. filed Jan. 21, 2010)(O'Keefe and another individual secretly recorded conversations and publicly disseminated video and audio recordings); *United States v. O'Keefe*, No. 10-cr0081 (E.D. La. May 27, 2010)(O'Keefe convicted of entry by false pretenses in violation of 18 U.S.C. § 1036(a)(1), (2)). Up until February 2023, Mr. O'Keefe was the CEO of Project Veritas but he was removed and/or left due to alleged "financial malfeasance" related to his use of "an excessive amount of donor funds" on personal luxuries and subsequently created OMG.

***Publication of Video by James O'Keefe/O'Keefe Media Group***

20. At 8:55 AM EST on September 4, 2025, Mr. Schnitt received a text on his personal cell phone while at work. Looking at it, he realized an earlier text had been sent at 1:33 AM EST that morning. The texts were from someone claiming they worked for OMG and asked him for comments on a number of specific quotes they alleged he had made during a hidden camera interview with an undercover reporter. One of the texts stated OMG had reached out to Defendant DOJ for comment and that Mr. Schnitt had until 10:00 AM EST to respond. The texts made no mention of "Skylar" or that this related to a private conversation he had on a "date" a month prior.

21. Mr. Schnitt was baffled by these texts because so far as he knew he had never talked to any journalist and did not know what the texts were about. Worried that he may be the subject of

a phishing scam, he showed them to a co-worker and then to his immediate supervisor. The supervisor asked if he had said any of the quotes and he replied he had not. He went back to his desk and continued to think about what the texts could refer to and only then connected the dots to his "date" with "Skylar". He then returned to his supervisor's office and provided her with the updated information. By that point she had been contacted by her supervisors about the alleged statements Mr. Schnitt had made, apparently as a result of OMG requesting Defendant DOJ provide a comment. He told her about the "date" and that he had only talked to the woman about information he learned through the news and his personal opinions based on that information. He was told to go back to his desk and prepare an e-mail outlining what had happened that would be sent to the Acting Director of the Office of Enforcement Operations.

22. Mr. Schnitt did as he was instructed. It was his understanding and expectation that the e-mail would be for internal use by his leadership only. His e-mail outlined the contours of his dates with "Skylar", how she had misrepresented herself and lied to secretly record him, and how the comments he had made were strictly his own personal opinion and only based on what he had learned in the media. He made clear he did not rely upon any official information and that he did not have any knowledge about the Epstein Files due to his employment responsibilities.

23. That same day, September 4, 2025, OMG and Mr. O'Keefe posted a video online at *https://okeefemedia group.com/breaking-doj-deputy-chief/*)(last viewed November 20, 2025) of Mr. Schnitt and "Skylar" on their August 4, 2025 date with the headline "BREAKING: DOJ Deputy Chief Admits Government Will 'Redact Every Republican' While "Leav[ing] All the Liberal, Democratic People' on the Epstein Client List; Says Ghislane Maxwell Was Moved to a Lower-Security Prison as 'A Benefit … to Keep Her Mouth Shut.'" (the "Video"). The Video was also posted the same day on OMG's YouTube channel at *https://www.youtube.com/watch?*

*v=h9wTbTBSBRo&t=204s*)(last viewed November 20, 2025) where it has been viewed over 58,000 times as of the date of this filing, and through Mr. O'Keefe's X account at *https://x.com/JamesOKeefeIII/status/196361787128143873l*)(last viewed November 20, 2025), where it has been "liked" over 35,000 times.

24. In the Video, various selected excerpts from Mr. Schnitt's first date with "Skylar" are played and which purport to show him making comments regarding the Epstein File, the Government's actions surrounding the matter, and Ms. Maxwell's transfer to a lower-level security prison. Among those remarks was Mr. Schnitt's suggestion that the Government would redact names of prominent Republicans while leaving unredacted names of prominent Democrats. Absent from the posted version(s) of the Video was any reference to Mr. Schnitt's statement(s) to "Skylar" that he was speaking only from personal opinion and solely based on information he learned from public news reports. Instead, the Video deliberately falsely portrayed Mr. Schnitt as suggesting he had personal internal knowledge of what actions the Government had taken or was going to take in processing the Epstein Files for release. To be clear, Mr. Schnitt had no such knowledge and never once told "Skylar" that he had any personal knowledge. No recordings from the second date, where "Skylar" continued to aggressively probe but Mr. Schnitt did not discuss the Epstein Files, were apparently used in the Video or have been posted online.

25. The article on the OMG website along with the Video states that OMG reached out to Defendant DOJ for comment and received a response that was posted online, including on Mr. O'Keefe's X account at *https://x.com/OKeefeMedia/status/1963640149335540028* (last viewed November 20, 2025):



**DEPARTMENT OF JUSTICE - OFFICIAL STATEMENT**

"Joseph Schnitt had no role in the Department's internal review of Epstein materials. He has confirmed as much to leadership and we plan to publish his written statement to that effect when we have it. In his own words, the comments Mr. Schnitt made were based on "what he learned in the media" and he "has no knowledge of the circumstances surrounding Ms. Maxwell other than what was reported in the news. These comments have absolutely zero bearing with reality and reflect a total lack of knowledge of the DOJ's review process. The DOJ is committed to transparency and is in compliance with the House Oversight Committee's request for documents."

26. At no time during any of the dates did "Skylar" inform Mr. Schnitt she was recording him with video and sound equipment. Mr. Schnitt never consented to being recorded and would never have agreed to being recorded. He justifiably believed these conversations were personal, private and solely between two adults on a date. In fact, notwithstanding the District of Columbia, where the second date occurred, being a one-party consent jurisdiction, 18 U.S.C. § 2511 and D.C. Code § 23-542 prohibit the interception and recording of a communication if it was for the purposes of committing a tortious act, which this was. In any event, Ms. Schnitt only talked about the Epstein case with "Skylar" because it was a topic being discussed nationally. Had he possessed any information about the topic through his official duties, he never would have said anything. But, like most people in the United States, it was a topic he was familiar with and seemingly normal to discuss, especially within the region of Washington, D.C.

*The Termination of Mr. Schnitt's Employment*

27. Also on September 4, 2025, without consulting with Mr. Schnitt or obtaining his consent, Defendant DOJ's official account on X (formerly Twitter) posted a tweet containing the exact

message Mr. Schnitt had e-mailed to his supervisor with no additional information. That tweet was also echoed by Mr. O'Keefe through a retweet.



Upon information and belief, the message was retrieved from and/or is currently stored in a Privacy Act System of Record pertaining to Mr. Schnitt.

28. The following day, on September 5, 2025, Mr. Schnitt was issued the Termination

Memo, which reads, in relevant part, as follows:

> This memorandum provides official notice that you are removed from your position of Acting Deputy Chief, GS-0301-14, Witness Security Program, Office of Enforcement Operations, Criminal Division, and from the federal service, effective immediately.

> Pursuant to Article II of the United States Constitution and the laws of the United States and based on your publicly inappropriate comments that were detrimental to the interests of the Department, your employment with the Department of Justice is hereby terminated, and you are removed from federal service effective immediately.

29. The Termination Memo was signed by Defendant AG Bondi and dated

the same day.

30. As a member of the civil service, Mr. Schnitt was entitled to procedural and substantive

due process before removal from federal service. The Defendants' summary removal of

him without such process was unlawful.

***Limitations on the Attorney General's Ability to Remove DOJ Employees***

31. Defendant AG Bondi does not have absolute authority, much less under Article II of the

Constitution, to simply remove DOJ employees without due process. Specifically, there are

crucial guardrails that protect employees from such arbitrary or unlawful termination.

32. The Defendants may only terminate Mr. Schnitt if doing so does not violate statutorily

defined prohibited personnel practices, and only after established due process procedures are

followed.

33. The limitations on Defendant AG Bondi's removal authority include, but are not limited

to, the Prohibited Personnel Practices, as administered and interpreted by the Office of Personnel

Management ("OPM"). *See* 5 U.S.C. § 2302(b).

34. OPM is explicitly charged with administering the federal civil service, which

encompasses all federal employment. *Id*. at § 1103(a)(5). Additionally, OPM is responsible for

promoting and enforcing nine Merit Systems Principles, which apply across the federal service and dictate that personnel actions (including removals) must be based on merit and fitness, and must not be arbitrary, capricious, or discriminatory. *Id*. at § 2301. These principles require that "[e]mployees should be protected against arbitrary action, personal favoritism, or coercion for partisan political purposes." *Id*. at § 2301(b)(8)(A).

35. OPM also administers and interprets the Prohibited Personnel Practices as outlined in § 2302(b). These statutory prohibitions prevent agencies from taking, or failing to take, personnel actions against members of the civil service for certain reasons. For example, agencies cannot discriminate against a person for conduct that does not adversely affect performance, their political affiliation, or their refusal to engage in any coerced political activity. *See e.g.*, at § 2302(b)(1)(prohibiting discrimination based on protected characteristics, including political affiliation); § 2302(b)(3)(prohibiting action taken against any employee as reprisal for refusal to engage in any coerced political activity); and § 2302(b)(10)(prohibiting discrimination based on conduct not adversely affecting performance).

***The Civil Service Reform Act and the Current Futility of the Merit System Protection Board***

36. Congress enacted the Civil Service Reform Act ("CSRA") in 1978, to create a uniform scheme for administrative and judicial review of covered federal employee personnel actions, in order to ensure a non-political career civil service for the good of the American public. That scheme sets forth the protections and remedies available to such employees as well as the procedural process they must follow. *Id*. at § 4301(b)(1).

37. In his role at DOJ, Mr. Schnitt was a member of the competitive service and was entitled to statutory protections under the CSRA. The CSRA provides that a covered employee "against whom an action is proposed is entitled to[:]" a minimum of "30 days' advance written notice[;]"

the opportunity to respond orally and in writing; representation; and "a written decision and the specific reasons therefor at the earliest practicable date." *Id*. at § 7513(b). Decisions are appealable, first to the Merit Systems Protection Board ("MSPB") and then to the United States Court of Appeals for the Federal Circuit. *Id*. at §§ 7513(d), 7703(b).

38. For its part, the MSPB is an independent agency consisting of three members, each appointed by the President with the advice and consent of the Senate to serve seven-year terms. *Id*. at §§ 1201, 1202(a)-(c). It is a quasi-judicial body, adjudicating conflicts between civil servants and their employing agencies and was designed to resolve disputes including federal employees' allegations that their government employer discriminated against them, retaliated against them for whistleblowing, violated protections for veterans, or otherwise subjected them to an unlawful adverse employment action or prohibited personnel practice. *Id*. at §§ 1204(a)(1), 1221, 2302(b)(1), (8)-(9), 3330a(d), and 7512.

39. By statute, no more than two members of the MSPB are permitted to be from the same political party, to ensure that federal employees are "protected against arbitrary action, personal favoritism, or coercion for partisan political purposes." *Id*. at §§ 1201, 2301. MSPB members serve seven-year terms—a term limit longer than that guaranteed to the appointing President. *Id*. at § 1202(a). The Senate must consent and confirm any MSPB member. *Id.* at § 1201.

40. As of this filing, there are now two members of the MSPB, Acting Chairman Henry J. Kerner and James. J. Woodruff II, which constitutes a quorum permitting votes on petitions for review. Mr. Kerner and Mr. Woodruff were both Republican nominations, which would require the third member to be a Democrat. Mr. Trump has not made a move to nominate anyone to the third position.

41. For preservation purposes, Mr. Schnitt filed an appeal with the MSPB on November 16, 2025, that challenged his termination. No actions have yet occurred.

42. Upon information and belief, MSPB administrative judges do not have the ability to issue timely decisions, particularly in light of the exponential increased caseload, and the Congressional intent of the CSRA cannot be met thereby permitting this Court to exercise jurisdiction over the dispute. Additionally, even if the MSPB could timely address the dispute, the Defendants have contended in numerous MSPB cases that it cannot as they contend that any Article II removal authority is plenary.

43. Therefore, because (a) the MSPB cannot perform its duties so that the claims of covered employees, such as Mr. Schnitt, are adequately processed or resolved, and (b) the Defendants have taken the position that the MSPB has no jurisdiction over what the Defendants characterize as an "Article II removal," the framework of the CSRA has been thwarted and this Court may exercise jurisdiction over the presented Constitutional and statutory challenges.

### FIRST CAUSE OF ACTION
### VIOLATION OF THE FIRST AMENDMENT
### (RETALIATION FOR PROTECTED SPEECH)
### (<u>Against All Defendants</u>)

44. Mr. Schnitt repeats and realleges the allegations contained in paragraphs 8 through 43 above, inclusive.

45. The First Amendment to the U.S. Constitution guarantees all individuals "the freedom of speech", which includes free expression and association. These rights allow government employees to speak on matters of public concern without fear of retribution and retaliation.

46. Mr. Schnitt's personal conversation during non-duty hours is quintessential protected speech on a matter of public concern. The Defendants have retaliated against Mr. Schnitt because

of that speech and unlawfully removed him from federal service due solely to the expression of his constitutionally protected freedom of speech.

47. Mr. Schnitt's protected speech did not take place in a Government facility, use Government equipment, or rely upon Government systems or databases. It did not consist of any information Mr. Schnitt learned during the course of his official duties. His protected speech consisted exclusively of open source, publicly available information reported in the news media, as well as his own personal opinions on matters of public concern. The Defendants publicly confirmed that Mr. Schnitt had no official knowledge about the case and that his comments were made in his personal capacity only.

48. Mr. Schnitt's protected speech had no known impact on the work he performed for the Defendants. Upon information and belief, the Defendants did nothing to determine whether Mr. Schnitt's protected speech had actually caused any kind of disruption or hampered his ability to perform his employment responsibilities.

49. The Defendants would not have terminated Mr. Schnitt in the absence of his protected speech. The sole stated basis for his termination was, in fact, his protected speech.

50. Mr. Schnitt has suffered adverse and harmful effects, including, but not limited to lost and/or jeopardized present and/or future financial opportunities.

### SECOND CAUSE OF ACTION
### VIOLATION OF THE FIFTH AMENDMENT
### (PROCEDURAL DUE PROCESS, PROPERTY INTEREST)
### (Against All Defendants)

51. Mr. Schnitt repeats and realleges the allegations contained in paragraphs 8 through 43 above, inclusive.

52. Mr. Schnitt has a protected property interest in his continued employment with DOJ.

53. Defendants' actions to terminate Plaintiffs without proper due process unlawfully deprived Mr. Schnitt of that property interest.

54. Mr. Schnitt has suffered adverse and harmful effects from the deprivation of his property interests in his employment, including, but not limited to, loss of income and lost or jeopardized present and future financial opportunities.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE FIFTH AMENDMENT
### (PROCEDURAL DUE PROCESS, LIBERTY INTEREST)
### (Against All Defendants)

55. Mr. Schnitt repeats and realleges the allegations contained in paragraphs 8 through 43 above, inclusive.

56. The Fifth Amendment's protection against deprivation of liberty without due process of law protects against reputational harm caused by government actors when that harm is accompanied by other harm. Here, the Government's actions harmed Mr. Schnitt's reputational interests by terminating them without cause, based solely on Defendant AG Bondi's alleged Article II authority and the laws of the United States. In addition, Defendants' actions have caused the loss of Mr. Schnitt's present government employment and have harmed his future employment prospects.

57. Mr. Schnitt was entitled by statutes, regulations and the Fifth Amendment to protection against deprivation of his liberty interest without the process required by law. The lack of any due process accorded to Mr. Schnitt deprived him of the ability to challenge the accuracy or merits of the basis for his removal, as well as to protect his reputation.

58. The Defendants' actions have prevented Mr. Schnitt from participating in his chosen profession or line of work. Should Mr. Schnitt apply to work for a federal agency or a private civilian employer for a position that requires even the most rudimentary background

investigation, the information Defendants have disseminated or may still disseminate, to include

known inaccurate and false information, will be easily discoverable and adversely impact his

reputation and chances for additional employment opportunities. As a result, the Defendants

have effectively stigmatized Mr. Schnitt's reputation and imparted a "status change" upon

him that has implicated his liberty interests.

59. As no opportunity was ever provided to Mr. Schnitt to respond to the termination and

removal action taken by Defendants, he is entitled to, among other remedies, a name-clearing

hearing regarding the false public statements regarding his actions and the basis for his removal.

60.  Mr. Schnitt has suffered adverse and harmful effects, including, but not limited to, lost or

jeopardized present or future financial opportunities.

<div align="center">

**FOURTH CAUSE OF ACTION**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**(*ULTRA VIRES* IN VIOLATION OF STATUTORY AUTHORITY)**
**(Against Defendants Bondi and DOJ)**

</div>

61. Mr. Schnitt repeats and realleges the allegations contained in paragraphs 8 through 43

above, inclusive.

62. Defendants AG Bondi and DOJ had no lawful authority to terminate Mr. Schnitt from

federal service without adhering to the statutory protections to which he was entitled. His

termination was therefore *ultra vires* and without legal force or effect.

63. Mr. Schnitt has suffered adverse and harmful effects, including, but not limited to, lost or

jeopardized present or future financial opportunities. As such, he is entitled to reinstatement, an

award of backpay and any other available damages.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**- 5 U.S.C. §§ 706(1) and 706(2)**
**(Against Defendants Bondi and DOJ)**

64. Mr. Schnitt repeats and realleges the allegations contained in paragraphs 8 through 43 above, inclusive.

65. Defendants AG Bondi and DOJ, in authorizing and signing the issuance of the Termination Memo, and by unlawfully failing to first provide obligated due process, implemented a final agency decision "not in accordance with the law," "contrary to a constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law" and "unwarranted by the facts." 5 U.S.C. § 706(2).

66. Mr. Schnitt has suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities.

**SIXTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT – 28 U.S.C. §§ 2201 and 2202**
**(Against All Defendants)**

67. Mr. Schnitt repeats and realleges the allegations contained in paragraphs 8 through 43 above, inclusive.

68. Mr. Schnitt is entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between Mr. Schnitt and the Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that the Defendants do not have authority to remove Mr. Schnitt without affording him all the rights and protections set forth by applicable statutes and regulations.

69. Mr. Schnitt has suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities.

## SEVENTH CAUSE OF ACTION
## WRIT OF MANDAMUS
## (Against All Defendants)

70. Mr. Schnitt repeats and realleges the allegations contained in paragraphs 8 through 43 above, inclusive.

71. In the alternative, Mr. Schnitt is entitled to a writ of mandamus commanding the Defendants to return him to his position of employment and not remove him from federal service without first following lawful procedures. Defendants have a legal duty not to terminate Mr. Schnitt without affording him the protections prescribed by law and, absent this Court granting relief, there is no other adequate means of redress.

72. The provisions of 28 U.S.C. § 1361 create jurisdiction in cases seeking a writ of mandamus against federal officers, employees, and agencies, and they provide for an independent cause of action in the absence of any other available remedies. To the extent relief is unavailable under either the APA, common law equity, or any other law to enjoin unlawful government action, mandamus lies here.

## EIGHTH CAUSE OF ACTION
## PRIVACY ACT – 5 U.S.C. § 552a(b), (g)
## (UNLAWFUL DISSEMINATION)
## (Against Defendant DOJ)

73. Mr. Schnitt repeats and realleges the allegations contained in paragraphs 8 through 43 above, inclusive.

74. Pursuant to 5 U.S.C. § 552a(b), no agency shall disclose any record which is contained in a system of records by any means of communications to any person, or to another agency, without prior written consent of the individual to whom the record pertains, with certain enumerated exceptions.

75. There is no exception that permitted Defendant DOJ, through one or more of its officials, to retrieve and then disseminate Privacy Act-protected information concerning Mr. Schnitt to the news media and/or other unauthorized third parties.

76. Mr. Schnitt never provided Defendant DOJ with written or verbal consent to disseminate any information retrieved from one or more Systems of Records that was identifiable to him.

77. Pursuant to 5 U.S.C. § 552a(g)(1), Mr. Schnitt may bring a civil action against Defendant DOJ for the unauthorized dissemination of information contained in a system of records.

78. Pursuant to 5 U.S.C. § 552a(g)(4), Mr. Schnitt is entitled to monetary damages in an amount not less than $1,000, due to the intentional and willful dissemination of information by Defendant DOJ to the media and/or elsewhere in violation of 5 U.S.C. § 552a(b).

<div align="center">

**REQUEST FOR RELIEF**

</div>

WHEREFORE, Plaintiff Joseph H. Schnitt, III requests that the Court award him the following relief:

(1) An order that the Defendants immediately reinstate Mr. Schnitt and enjoin them from taking any further adverse personnel action against him without providing appropriate procedural and substantive due process as required by law and the Fifth Amendment;

(2) A declaration that the Defendants' termination of Mr. Schnitt's employment was in retaliation for protected speech under the First Amendment and that Mr. Schnitt is entitled to appropriate relief;

(3) A declaration that the Defendants' actions violated Mr. Schnitt's Fifth Amendment due process and statutory rights and order appropriate relief, to include, but not limited to, a name-clearing hearing;

(4) A declaration that Defendants Bondi and DOJ violated the Administrative Procedure Act;

(5) A declaration that Defendant DOJ violated the Privacy Act, and order monetary compensation as permitted by law;

(6) An award of backpay and other monetary and administrative relief as appropriate;

(7) Award of the costs of this action and reasonable attorney fees under the Equal Access to Justice Act or any other applicable law; and

(8) grant such other relief as the Court may deem just and proper.

Date:    November 24, 2025

<div style="margin-left:40%">

Respectfully submitted,

/s/ *Mark S. Zaid*

_____
Mark S. Zaid, Esq.
D.C. Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Geoffrey Deweese, Esq.
(*Pro Hac Vice* pending)
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20036
(202) 498-0011
Mark@MarkZaid.com
Brad@MarkZaid.com
Geoffrey@MarkZaid.com

Attorneys for the Plaintiff

</div>