**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOSEPH H. SCHNITT, III | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No: 25-4111 (CRC) |
| | * | |
| PAMELA J. BONDI <u>et al.</u> | * | |
| | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**PLAINTIFF'S MEMORANDUM OF LAW IN**
**<u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

## Table Of Contents

**FACTUAL AND PROCEDURAL BACKGROUND** . . . . . . . . . 2

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . 2

**I.** **APPLICATION OF THE FIRST STEP OF THE *THUNDER BASIN* TEST PERMITS THIS COURT TO RETAIN JURISDICTION** . . . . . . 5

    **A.** **The Lynchpin of the CSRA Was an Independent MSPB** . . . . . . 5

    **B.** **The MSPB Is No Longer Independent As A Matter Of Fact Or Law** . . 7

        *1.* *The Trump Administration's Actions Require This Court To Conduct A New Examination Of The Independence Of The MSPB* . . . . . . . . 10

            *i.* *The President Has Fired a Member of the MSPB Without Cause* . . . 12

            *ii.* *The President Also Asserts the Right to Fire MSPB Administrative Judges Without Cause* . . . . . . . . . . . . . . . . . . . . 12

            *iii.* *The President Asserts the Authority to Instruct the MSPB and Its Administrative Judges How to Construe and Apply the Law, Including in Specific Pending Cases* . . . . . . . . . . . . . . . 13

            *iv.* *The Defendants Have Asserted That Chapter 75 Due Process Procedures Cannot Be Constitutionally Applied To The President If He Waives Them* 15

    **C.** **This Case Involves a Direct Assertion of Presidential Power To Fire Employees While At the Same Time Complete Control of the MSPB Has Been Seized** . . . . . . . . . . . . . . . . . . . . . 16

    **D.** **Resort to the MSPB Would Be Futile For Mr. Schnitt** . . . . . . 17

    **E.** **Defendants' Arguments to the Contrary Are Unavailing** . . . . . 18

**II.** **APPLICATION OF THE SECOND PRONG OF THE *THUNDER BASIN* TEST REQUIRES THIS COURT TO RETAIN JURISDICTION** . . . 19

    **A. Congress Did Not Intend Broad, Structural, Constitutional Challenges to the MSPB's Organic Statute to Be Reviewed by the MSPB** . . . . . 20

    **B. *Free Enterprise Fund* Is Controlling And Also Permits Jurisdiction** . . 23

**III. FORCING MR. SCHNITT TO PROCEED BEFORE THE MSPB WOULD SUBJECT HIM TO A "HERE AND NOW INQUIRY" UNDER *AXON*** . . 26

**IV. THIS COURT MUST RETAIN JURISDICTION OVER MR. SCHNITT'S LIBERTY INTEREST CLAIM** . . . . . . . . . . . . . . . 28

   **A. Mr. Schnitt Possesses A Viable Fifth Amendment Liberty Interest Claim** . 28

   **B. Application of the Second Prong of the *Thunder Basin* Test Requires This Court to Retain Jurisdiction Over Mr. Schnitt's Liberty Interest Claim** . 30

**Conclusion** . . . . . . . . . . . . . . . . . . . 34

ii

**TABLE OF AUTHORITIES**

**CASES**

Cases chiefly relied upon are designed by *.

*Abramowitz v. Lake*, 803 F.Supp.3d 1 (D.D.C. 2025) . . . . . . . . . 10,21,22,24,26

*AFGE v. U.S. Dep't of Educ.*, 2025 U.S. Dist. LEXIS 220612 (D.D.C. Nov. 7, 2025) . 10,20,23

*Am. Fed. of Gov't Emps. v. Trump*, 929 F.3d 748 (D.C. Cir. 2019) . . . . . . . 19

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) . . . . . . . . . . . . *passim*

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) . . . . . . 2

*Board of Regents v. Roth*, 408 U.S. 564 (1972) . . . . . . . . . . . 28

*Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667 (1986) . . . . . . . 20,23

*Brooks v. OPM*, 59 M.S.P.R. 207 (1993) . . . . . . . . . . . . . 21

*Cannon v. Village of Bald Head Island*, 891 F.3d 489 (4th Cir. 2018) . . . . . . 30

*Carr v. Saul*, 593 U.S. 83 (2021) . . . . . . . . . . . . . . 17,22

*Cohens v. Virginia*, 6 Wheat. 264 (1821) . . . . . . . . . . . . . 5

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) . . . 4,5

*Comans v. EOP et al.*, Civil Action No. 25-1237 (E.D.VA)(MSN-WEF) . . . . . 3

*Comey v. DOJ et. al.*, Civil Action No. 25-7625 (E.D.N.Y.)(JMF) . . . . . . . 3

*Does 1-9 et al. v. Patel*, Civil Action No. 25-4258 (D.D.C.)(TNM) . . . . . . . 3

*Driscoll et al. v. Patel et al.*, Civil Action No. 25-3109 (D.D.C.)(JMC) . . . . . 3

*Elgin v. Dep't of the Treasury*, 567 U.S. 1 (2012) . . . . . . . . . 3,4,6,18,21,33

*Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551 (D.C. Cir. 2023) . . . . . . 19

*Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005) . . . . . . . . . . . 19

*Free Enterprise Fund v. Public Co Accounting Oversight Bd*, 561 U.S. 477 (2010) . 23,24

*Garman et al. v. Patel et al.*, Civil Action No. 26-1086 (D.D.C.)(JMC) . . . . . . 3

*Gordon et al. v. EOP et al.*, Civil Action No. 25-2409 (D.D.C.)(JMC) . . . . . . 3

*Grosdidier v. Chairman, Broad Bd. of Governors*, 560 F.3d 495 (D.C. Cir. 2009) . . . 19

*Harris v. Bessent*, 160 F.4th 1235 (D.C. Cir. 2025), *petition for en banc rehearing denied*, 2026 U.S. App. LEXIS 2203 (January 28, 2026), *cert. pending* . . . . . . 12

*Heckler v. Ringer*, 466 U.S. 602 (1984) . . . . . . . . . . . . . . 32

*Houghton v. Shafer*, 392 U.S. 639 (1968). . . . . . . . . . . . . 18

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) . . . . . . . 12,27

*Jablonski v. Patel et. al.*, Civil Action No. 26-449 (D.D.C.)(JMC) . . . . . . . 3

*Jackler and Jaroch Consolidation v. DOJ et al.*, Docket No. CF-0752-26-0069-I-1 (March 20, 2026) . . . . . . . . . . . . . . . . . 15,17

*Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015) . . . . . . . . . . . 22

*Leedom v. Kyne*, 358 U.S. 184 (1958) . . . . . . . . . . . . . 31

*Lucas v. Am. Fed'n of Gov't Employees*, 151 F.4th 370 (D.C. Cir. 2025) . . . . . 23

*Lyons v. Barrett*, 851 F.2d 406 (D.C. Cir. 1988) . . . . . . . . . . 30

*Malone v. Dep't of Justice*, 14 M.S.P.R. 403 (1983) . . . . . . . . . . 21

*Mathews v. Eldridge*, 424 U.S. 319 (1976) . . . . . . . . . . . . 31

*McCarthy v. Madigan*, 503 U.S. 140 (1992) . . . . . . . . . . . 4,18

*McIntosh v. Department of Defense*, 53 F.4th 630 (Fed. Cir. 2022) . . . . . . 7,12

*Nat'l Ass'n of Immigration Judges v. Owen*, 139 F.4th 293 (4th Cir. 2025), *cert pet. pending*, No. 25-767 (Dec. 30, 2025) . . . . . . . 7,10,11,16,32,33

*Nicholas Serv. LLC et al. v. DOL*, 2026 U.S. Dist. LEXIS 69349 (N.D.Miss. Mar. 31, 2026) 27

*Pearson v. Patel et. al.*, Civil Action No. 26-509 (D.D.C.)(RJL) . . . . . . . 3

*Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90 (D.C. Cir. 1986) . . . 18

*Ratliff v. City of Milwaukee*, 795 F.2d 612 (7th Cir. 1986) . . . . . . . . . . 33

*Riggin v. Off. of Senate Fair Emp. Pracs.*, 61 F.3d 1563 (Fed. Cir. 1995) . . . . . 25

*Robertson v. Rogers*, 679 F.2d 1090 (4th Cir. 1982) . . . . . . . . . . . 29

*Sciolino v. City of Newport News*, 480 F.3d 642 (4th Cir. 2007) . . . . . . . . 30

*Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020) . . . 12

*Special Counsel v. Gallagher*, 44 M.S.P.R. 57 (1990) . . . . . . . . . . 21

*Special Counsel v. Jackson*, 119 M.S.P.R. 175 (2013) . . . . . . . . . . 21

*Tarquinii v. Del Toro*, U.S. Dist. LEXIS 174016, 2024 WL 4298857 (D.D.C. Sep. 26, 2024) 21

*\*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). . . . . . . . . *passim*

*Trump v. Slaughter*, No. 25-332 (argued December 8, 2025) . . . . . . . . 27

*United States v. Fausto*, 484 U.S. 439 (1988) . . . . . . . . . . . 6,18,19

*Wilson v. Off. of Pers. Mgmt.*, No. DC-0831-13-0423-P-1, 2015 WL 502974
(M.S.P.B. Feb. 6, 2015) . . . . . . . . . . . . . . . . . 31

**STATUTES**

5 U.S.C. § 1201 . . . . . . . . . . . . . . . . . . 8

5 U.S.C. § 1202(a) . . . . . . . . . . . . . . . . . 8

5 U.S.C. § 1202(d) . . . . . . . . . . . . . . . . 7,13

5 U.S.C. § 1204(a) . . . . . . . . . . . . . . . . . 8

5 U.S.C. § 1204(j) . . . . . . . . . . . . . . . . 7,12

5 U.S.C. § 2301(8)(a) . . . . . . . . . . . . . . . . 8

5 U.S.C. § 7513(a) . . . . . . . . . . . . . . . . 7,12

5 U.S.C. § 7513(b) . . . . . . . . . . . . . . . . . 3

5 U.S.C. § 7513(d) . . . . . . . . . . . . . . . . . 4

5 U.S.C. § 7521(a) . . . . . . . . . . . . . . . . . 13

5 U.S.C. § 7701(a) . . . . . . . . . . . . . . . . . . . 4,33

5 U.S.C. § 7703(a)(1)-(2) . . . . . . . . . . . . . . . . 4

5 U.S.C. § 7703(c) . . . . . . . . . . . . . . . . . . . 4

5 U.S.C. § 7703(c)(3) . . . . . . . . . . . . . . . . . . 26

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . 5

**OTHER AUTHORITIES**

Acting Solicitor General Sarah M. Harris to Hon. Charles Grassley, *Multilayer Restrictions on the Removal of Administrative Law Judges* (Feb. 20, 2025), *https://iptp-production. s3.amazonaws.com/media/documents/2025.02.20   DOJ   letter   re   ALJs.pdf* . . 12,13

Civil Service Reform Act of 1978, S. Rep. 95-969 (July 10, 1978) . . . . . . . . 8,9

Department of Justice, Office of Legal Counsel, "The Merit Systems Protection Board's Authority to Adjudicate Constitutional Questions within an Administrative Proceeding," *https://www.justice.gov/olc/media/1415466/dl* . . . . . . . . . . . . 14

Department of Justice, Office of Legal Counsel, "Constitutionality of the Presidential Records Act (April 1, 2026) at 1, at *https://www.justice.gov/olc/media/1434131/dl?inline* . . 14

Executive Order 14215 (Feb. 18, 2025), *https://public-inspection.federalregister.gov/2025-03063.pdf* . . . . . . . . . . . . . . . . . . . . . . 13,14

Fed. R. Civ. P. 12(b)(1), (b)(6) . . . . . . . . . . . . . . . . . 3

*Improving Performance, Accountability and Responsiveness in the Civil Service*, RIN: 3206-AO80, 91 Fed. Reg. 5,580 (Feb. 6, 2026), at *https://www.federalregister.gov/documents/ 2026/02/06/2026-02375/improving-performance-accountability-and-responsiveness-in-the-civil-service* . . . . . . . . . . . . . . . . . . 15,16,25

Jimmy Carter, *Federal Civil Service Reform Message to the Congress*, The American Presidency Project (March 2, 1978), *https://www.presidency.ucsb.edu/documents/ federal-civil-service-reform-message-the-congres*s . . . . . . . . . . . 8

Statement of Justice Department Chief of Staff Chad Mizelle, DOJ (Feb. 20, 2025), *https://www.justice.gov/opa/pr/statement-justice-department-chief-staff-chad-mizelle* . 13

Transcript of Proceedings, *Trump v. Slaughter*, No. 25-332 (argued December 8, 2025) . 27

**ARTICLES**

"Pam Bondi already fired as attorney general, Cabinet official teed up as replacement: sources," Fox News, April 2, 2026, at *https://www.foxnews.com/politics/pam-bondi-already-fired-attorney-general-cabinet-official-teed-up-replacement-sources* . . . 1

Sarah N. Lynch & Andrew Goudsward, *US Justice Department Fires Several More Employees From Jack Smith's Team, Sources Say*, REUTERS (July 14, 2025) at *https://tinyurl.com/2fp8k9k6* . . . . . . . . . . . . . . . . 25

Emily Ngo, *Immigration courts thrown into chaos as Trump administration purges dozens of judges*, POLITICO (Dec. 6, 2025), *https://www.politico.com/news/2025/12/06/trump-immigration-court-judge-purges-00679376?utm_medium=twitter&utm_source=dlvr.it*. 13

*https://x.com/OKeefeMedia/status/1963640149335540028* . . . . . . . . . 28

"DOJ responds to official's Epstein comments in hidden-camera," Fox8, September 5, 2025, at video*https://myfox8.com/news/doj-responds-to-officials-epstein-comments-in-hidden-camera-video/* . . . . . . . . . . . . 29

"DOJ Posts Embarrassing Apology Over Official Caught in Honeypot Trap," Daily Beast, September 5, 2025, at *https://www.thedailybeast.com/doj-posts-embarrassing-apology-over-official-caught-in-honeypot-trap/* . . . . . . . . . . . . . 29

"DOJ Responds to Secret Tape of Official Detailing Epstein Files Plan," The New Republic, September 4, 2025, at *https://newrepublic.com/post/200027/justice-department-official-project-veritas-o-keefe-epstein-files-video* . . . . . . . . . . 29

"DOJ Official Makes Epstein Cover-Up Claims in Hinge Date Honey Trap," Newsweek, September 4, 2025, at *https://www.newsweek.com/doj-official-makes-epstein-claims-hinge-date-honeypot-trap-2125013* . . . . . . . . . . . . . . 29

"DOJ official says comments on Epstein caught on hidden camera were just 'personal comments'," MSNOW, September 4, 2025, at *https://www.ms.now/top-stories/latest/epstein-files-redaction-hidden-camera-doj-rcna229348* . . . . . . . . 29

Plaintiff Joseph H. Schnitt, III, ("Mr. Schnitt") was a veteran employee of the Defendant Department of Justice ("DOJ") for over twenty years. He served as Acting Deputy Chief of the Special Operations Unit within the Office of Enforcement Operations in the Criminal Division, where, among other matters, he managed the Federal Witness Security Program (what is often known to the public as WITSEC). That is, until September 5, 2025, when Defendant Attorney General Pamela J. Bondi ("AG Bondi")[1], under the authority of the President (collectively "Defendants"), summarily fired him without any warning or due process.

His "offense": Mr. Schnitt was videotaped and recorded without his consent in the Commonwealth of Virginia during a private date where he exercised his First Amendment rights to voice his personal opinions concerning the government's processing and release of files concerning noted pedophile Jeffrey Epstein (which many would now argue have been proven as true even though they were not based on any information he learned through his employment). James O'Keefe and his right-wing organization maliciously posted the video online, along with exaggerated and/or false commentary, and caused Mr. Schnitt's world to change and ostensibly end his federal career.

The Defendants actions, through issuance of a one-page memorandum "[p]ursuant to Article II of the United States Constitution and the laws of the United States []", to terminate Mr. Schnitt violated his constitutional rights as well as internal regulations and statutes that require due process to have been provided to him. Mr. Schnitt filed a preservation appeal to the U.S. Merit System Protection Board ("MSPB") subsequent to the initiation of this lawsuit that has been effectively stayed, with no substantive movement having transpired. The fact is neither the Civil

---

[1] As of the filing of this Opposition, it appears Defendant Bondi has been fired from her job as Attorney General and Deputy Attorney General Todd Blanche has become Acting Attorney General. *See https://www.foxnews.com/politics/pam-bondi-already-fired-attorney-general-cabinet-official-teed-up-replacement-sources*.

Service Reform Act ("CSRA") or the MSPB are functioning in a manner consistent with Congressional intent.[2] Based on reasonable interpretations of judicial precedent and the unique and usual factual circumstances that now exist, this Court is permitted to exercise jurisdiction and adjudicate Mr. Schnitt's claims that challenge the authority of the Defendants to assert Article II powers and terminate federal employees as if they were employed "at-will".

This case, along with many others pending in this District and its sister courts, seeks to have the Court take the necessary steps to restore the integrity and strength that once described the arena of civil service protections.

**FACTUAL AND PROCEDURAL BACKGROUND**

Given at the motion to dismiss stage Mr. Schnitt's factual allegations as outlined in his Complaint are taken as true, *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015), the Defendants have accurately summarized the allegations and procedural timeline, Defs' Memo at 16-17, thus negating the need for Mr. Schnitt to duplicate them here. *See* Complaint, at ¶¶8-43, Dkt. 1.

**ARGUMENT**

This is one of several lawsuits pending before this and other Districts challenging Defendants' improper broad exercise of powers under Article II of the U.S. Constitution to summarily dismiss federal employees (non-principal officers) without any due process,

---

[2] The Defendants correctly point out that Mr. Schnitt has simultaneously noticed an appeal to the MSPB. This was done for preservation purposes given that, unlike here, the MPSB has mandatory filing deadlines. Defendants' Memorandum of Law in Support of Rule 12(b)(1) and Rule 12(b)(6) Motion to Dismiss for Lack of Jurisdiction and Failure to State a Claim at 13 (Defs' Memo")(Dkt. 9-1). *See* Complaint at ¶41, Dkt. 1. But, contrary to Defendants' view, this is not dispositive, and they offer no serious attempt at an argument beyond that simple conclusory sentence. If anything, it is noteworthy that this lawsuit was deliberately filed first.

2

notwithstanding statutory or regulatory rights to the contrary.[3] Defendants have moved to dismiss Mr. Schnitt's eight distinct claims in their entirety under Fed. R. Civ. P. 12(b)(1) and (b)(6) on the grounds that this Court lacks subject matter jurisdiction and fails to state a claim.[4]

The Defendants primarily argue that this Court lacks jurisdiction because Mr. Schnitt was obligated to bring all claims arising from the termination of his employment to the MSPB. *See* Defs' Memo at 2 ("The Act channels review of such claims through the MSPB and, from there, to the Federal Circuit."). The Defendants' rest their hope on the view that "[w]ithout exception, the Supreme Court and the D.C. Circuit alike have held that personnel actions like those at issue in Counts One through Seven of Plaintiff's complaint are exclusively channeled away from district court review for employees to whom the CSRA provides remedies." *Id*. at 10. Had this case been brought prior to January 20, 2025, it is likely the undersigned would have agreed with the Defendants. Indeed, this lawsuit probably never would have been filed because it would not have been necessary.

In the past, Mr. Schnitt would have received his "right to notice, representation by counsel, an opportunity to respond, and a written, reasoned decision from the agency." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 6 (2012), *quoting* 5 U.S.C. § 7513(b). Had his agency taken final

---

[3] A non-exhaustive list of the non-principal officer lawsuits includes *Garman et al. v. Patel et al.*, Civil Action No. 26-1086 (D.D.C.)(JMC)(former FBI agents); *Pearson v. Patel et. al.*, Civil Action No. 26-509 (D.D.C.)(RJL)(former FBI analyst); *Jablonski v. Patel et. al.*, Civil Action No. 26-449 (D.D.C.)(JMC)(former FBI analyst); *Does 1-9 et al. v. Patel*, Civil Action No. 25-4258 (D.D.C.)(TNM)(former FBI agents); *Driscoll et al. v. Patel et al.*, Civil Action No. 25-3109 (D.D.C.)(JMC)(former senior FBI officials); *Gordon et al. v. EOP et al.*, Civil Action No. 25-2409 (D.D.C.)(JMC)(former DOJ officials); *Comey v. DOJ et. al.*, Civil Action No. 25-7625 (E.D.N.Y.)(JMF)(former DOJ prosecutor); *Comans v. EOP et al.*, Civil Action No. 25-1237 (E.D.VA)(MSN-WEF)(former FEMA Chief Financial Officer).

[4] Mr. Schnitt voluntarily withdraws his Eighth Cause of Action under the Privacy Act of 1974. Complaint, at ¶¶73-78.

adverse action against him, Mr. Schnitt would have been entitled under the CSRA to a hearing and to be represented by an attorney before the MSPB. *Elgin*, 567 U.S. at 6, *citing* 5 U.S.C. §§ 7513(d), 7701(a)(1)-(2). If dissatisfied with the MPSB decision, Mr. Schnitt would have had the option to then appeal to the Federal Circuit Court of Appeals, which would have reviewed the factual record developed at the MSPB. *Id*. at §§ 7703(a)(1), (c).

But today's climate is completely different. None of that will or can ever happen for Mr. Schnitt. There was no due process. There is no record. What was once up is now down. And what the Defendants are not telling this Court is that judges are starting to recognize the unusual – if not unique – power changes that are now being faced by federal employees.

The Defendants rely on a set of court decisions that have previously identified congressional intent to "channel" all such claims to the MSPB. Reliance on those prior precedents is now seriously misplaced for at least two reasons: (1) the central rationale of the prior decisions no longer applies given the radical changes that have occurred with respect to the independence of the MSPB since January 2025; and (2) Defendants' unprecedented claim that the CSRA is unconstitutional when applied to the President and his Department heads upon invocation of his Article II authority is not the type of claim Congress intended to channel to the MSPB.

In fact, Defendants cannot point to any provision of the CSRA or any other statute that unequivocally strips federal courts of jurisdiction over all cases arising out of the termination of federal employees. Indeed, the Supreme Court has made clear that "federal courts are vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them" and "'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992), *quoting Colorado River Water*

4

*Conservation Dist. v. United States,* 424 U.S. 800, 817–818 (1976) and *Cohens v. Virginia,* 6 Wheat. 264, 404 (1821).

Defendants primarily rely on the Supreme Court's decision in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), *see* Defs' Memo at 11-16, and the Parties agree that the starting point for this Court is to apply the "two-step inquiry" set forth in that case. *Thunder Basin*, 510 U.S. at 207.

## I.    APPLICATION OF THE FIRST STEP OF THE *THUNDER BASIN* TEST PERMITS THIS COURT TO RETAIN JURISDICTION

The Defendants argue that Counts One through Seven should be dismissed for lack of jurisdiction. Defs' Memo at 10. They claim that "under binding Supreme Court and D.C. Circuit precedent, Congress has affirmatively stripped district courts of § 1331 jurisdiction over claims regarding adverse personnel decisions for federal employees covered by the CSRA". *Id*. Defendants further argue that such congressional intent is expressed in the CSRA, but when examined in light of today's unusual and unique circumstances they are wrong. This Court must first determine if a congressional intent to strip District Courts of their ordinary jurisdiction to resolve federal questions is "fairly discernible in the statutory scheme." *Thunder Basin*, 510 U.S. at 207. Only if that step favors channeling does the Court proceed to the second step.

### A.  The Lynchpin of the CSRA Was an Independent MSPB

As the Defendants themselves explain, the CSRA established a process through which federal employees may enforce their rights that is centrally premised on the independence of the administrative agency and judges who adjudicate employees' appeals. But now, unlike during the period when the central cases cited by Defendants were decided, those decision-makers are no longer independent. Both the MSPB Members and its Administrative Judges are being directed by and can be fired by the President, as well as literally instructed as to what their

rulings need to be. That is particularly problematic when the question of whether the President and his Department heads possess authority under Article II to fire employees such as Mr. Schnitt without cause or due process is the sole issue. Congress did not intend to relegate federal employees to a process controlled by the very individuals whose authority are being challenged.

"[W]hether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Id*. (internal citation omitted). In prior cases where the Supreme Court held that the CSRA precludes the invocation of federal question jurisdiction in the district courts it pointed to "the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions," and that led to the conclusion that "it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Elgin*, 567 U.S. at 11; *see also United States v. Fausto*, 484 U.S. 439, 443 (1988)(explaining CSRA "prescribes in great detail the protections and remedies applicable to such actions, including the availability of administrative and judicial review"). In *Fausto*, the Court described "the primacy of the MSPB for administrative resolution of disputes over adverse personnel action." *Id*. at 449. Given that the MSPB was created to adjudicate appeals from employees of adverse personnel actions taken by federal departments and agencies (most of which are headed by officers who serve at the pleasure of the President), Congress created the MSPB as an independent agency insulated from influence by those entities and the President. The express terms of the Act, its structure, and its legislative history make that clear. *See id.* at 444. That design was not accidental. In evaluating *Elgin* and *Fausto* in the current climate, the Fourth Circuit recently noted:

> Those cases would have, until recently, made our analysis at step one of the *Thunder Basin* test simple. It has been well-established that Congress's intent for

> the CSRA to preclude district court jurisdiction is "fairly discernible in the statutory scheme." [*Elgin*, 567 U.S.] at 17. That conclusion can only be true, however, when the statute functions as Congress intended. During the pendency of this case, whether the CSRA functions as Congress intended has been called into question.

*Nat'l Ass'n of Immigration Judges v. Owen*, 139 F.4th 293, 305 (4th Cir. 2025), *cert pet. pending*, No. 25-767 (Dec. 30, 2025).

The Defendants decry Mr. Schnitt's argument as "novel" and an attempt to "radically remake the analytical framework that the Supreme Court and D.C. Circuit have articulated". Defs' Memo at 16-17. Regardless of how Mr. Schnitt's arguments are described, the reality is that the centerpiece of the CSRA – an independent MSPB – has been utterly destroyed by the current Administration and that requires – as courts have started to recognize the unusual and unique circumstances that now exist – a revised application of the *Thunder Basin* test that does not require channeling.

### B.  The MSPB Is No Longer Independent As A Matter Of Fact Or Law

Prior to January 2025, few would have debated the history or statutory schematic of the points below, but they are crucial to understand in the context of this current debate to evaluate the independence of the MPSB.

The text of the CSRA was designed to prevent the President or any other Executive Branch official from removing Members of the MSPB without cause. *See* 5 U.S.C. § 1202(d). Similarly, the Board's Administrative Judges were to be statutorily protected from removal without cause. *See Id.* at § 7513(a); *McIntosh v. Department of Defense*, 53 F.4th 630, 640 (Fed. Cir. 2022). Congress intended that the MSPB appoint its Administrative Judges, and that their decisions be insulated from the MSPB's employment decisions from "approval or supervision of the Office of Personnel Management or the Executive Office of the President." 5 U.S.C. § 1204(j).

The structure of the CSRA is supposed to reinforce the centrality of the independence of the MSPB. The Act established a bipartite structure, creating both the MSPB and the Office of Personnel Management ("OPM"), the latter of which serves as "the arm of the President in matters of personnel administration." Civil Service Reform Act of 1978, S. Rep. 95-969 at 24 (July 10, 1978). The MSPB, in contrast, plays a quasi-judicial role, adjudicating appeals from personnel actions taken by agencies on the advice of the OPM and thus the President. *Id.*; 5 U.S.C. § 1204(a). By statute, no more than two members of the MSPB are permitted to be from the same political party, to ensure that federal employees are "protected against arbitrary action, personal favoritism, or coercion for partisan political purposes." *Id*. at §§ 1201, 2301(8)(a). MSPB members serve seven-year terms – terms longer than that guaranteed to the appointing President, thereby preventing a new President from immediately appointing all members of the Board. *Id.* at § 1202(a). All of those structural features of the CSRA reinforce the conclusion that an independent MSPB was central to the congressional design and intent.

Of course, the Act's legislative history further supports the conclusion that Congress premised any intention to displace federal court jurisdiction on an independent MSPB. President Carter, in his Federal Civil Service Reform Message to the Congress that transmitted the package of reforms that became the CSRA, explained that the reforms were intended to "ensure that employees and the public are protected against political abuse of the system." *Id*. Jimmy Carter, *Federal Civil Service Reform Message to the Congress*, The American Presidency Project (March 2, 1978), *https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-message-the-congres*s. The message made clear that the President intended the reforms to remove adjudication from the control of the President. President Carter explained that the Civil Service Commission, whose functions the CSRA split between OPM and the MSPB, had

8

"assumed ... inherently conflicting responsibilities. It serves simultaneously both as the protector of employee rights and the promoter of efficient personnel management policy. It is a manager, rulemaker, prosecutor and judge." *Id*. Presider Carter further explained, "I propose to correct the inherent conflict of interest within the Civil Service Commission by ... replacing it with a Merit Protection Board and Office of Personnel Management." *Id*. The Merit Board "will be headed by a bipartisan board of three members . . . removable only for cause." *Id*. "This structure will guarantee independent and impartial protection to employees." *Id*.

The Senate Report on what became the CSRA similarly explains that the legislation created an administrative system of adjudication that was to serve as "a vigorous protector of the merit system" – the centerpiece of which was "a strong and independent [MSPB]." S. Rep. 95-969 at 6–7. Congress intended to eliminate the "spoils" system of the 19th century, in which employees were hired and fired based on "political or personal favoritism." *Id.* at 2–3. "The lack of adequate protection [against partisan pressures] was painfully obvious during the civil service abuses" of the past. *Id.* at 6–7. Instead, Congress sought to ensure that employees were "hired and removed on the basis of merit" and "competence." *Id.* at 2–3.

An MSPB independent of the President was intended to be "the Cornerstone of Civil Service Reform." *Id.* at 7. In order to effectuate the purpose of preserving the merit system by preventing partisan intervention, Congress recognized that the MSPB had to be "insulated from the kind of political pressures that [had] led to violations of merit principles in the past." *Id*. Congress explained that "absent such a mandate for independence for the merit board, it is unlikely that [it] would have granted the Office of Personnel Management the power it has or the latitude to delegate personnel authority to the agencies." *Id.* The CSRA thus incorporated President Carter's recommendation by "provid[ing] for an independent merit systems protection board . . . to

9

adjudicate employee appeals and protect the merit system." *Id*. at 2. Congress repeatedly stressed the centrality of a MSPB free from "*any control or direction by the President.*" *Id.* at 24 (emphasis added).

1.  *The Trump Administration's Actions Require This Court To Conduct A New Examination Of The Independence Of The MSPB*

Contrary to the Defendants' characterization, there is nothing novel about Mr. Schnitt's arguments and concerns. And notwithstanding the Defendants' assertion that courts have held channeling is the requirement "without exception", Defs' Memo at 10, those exceptions actually now exist. Indeed, after reviewing the text, structure, and legislative history of the CSRA, the Fourth Circuit recently emphasized the issue of channeling was now a subject of question because "[t]he CSRA's adjudicatory scheme was predicated on the existence of a functioning and independent MSPB". *Owen*, 139 F.4th at 304. *See also Abramowitz v. Lake*, 803 F.Supp.3d 1, 11 (D.D.C. 2025)("That does not mean, however, that the CSRA's 'statutory review scheme ... necessarily extend[s] to every claim concerning' the removal a federal officer."), *quoting Axon Enter., Inc. v. FTC, 598 U.S. 175, 185 (2023)*. *But cf. AFGE v. U.S. Dep't of Educ.*, 2025 U.S. Dist. LEXIS 220612, *13 (D.D.C. Nov. 7, 2025)("Resolution of Thunder Basin's first step here is straightforward: Congress clearly intended to preclude district court jurisdiction over claims that fall within the CSRA" but determined channeling was not required given second step).

Notably, based on the review of the current reality, the Fourth Circuit in *Owen* explicitly questioned whether an "independent MSPB" exists any longer and opined that "a new examination of Congressional intent may be required in light of changing circumstances around the MSPB['] . . . removal protections" and related changes. *Owen*, 139 F.4th at 308. The District

Court was directed to first conduct a fact-finding inquiry into the "functionality of the CSRA's adjudicatory scheme." *Id*. at 304, 305.[5]

Since *Owen*, facts indicate even more strongly that Congress did not intend to relegate Mr. Schnitt's claims to the MSPB. Importantly, since the Fourth Circuit's decision, which was decided back in June 2025, several significant changes further demonstrate that the MSPB lacks independence including: (1) the D.C. Circuit upholding the President's removal without cause or due process of a Member of the MSPB; (2) the President's assertion of authority to remove Administrative Law Judges and MSPB Administrative Judges, as well as the termination of almost 100 Immigration Judges under the guise of the President's Article II authority; (3) the President's assertion of authority to inform, through Defendant DOJ, all Executive Branch agencies – including the MSPB – how to construe federal law, and that the President gave such instructions in specific, pending cases involving the assertion of Article II authority to fire employees and (4) that the MSPB is constitutionally powerless to adjudicate the claims raised by Mr. Schnitt.[6] Moreover, the circumstances before the Fourth Circuit in *Owen* did not even involve the President's direct assertion of authority or the invocation of Article II authority by a Department head. Therefore, Mr. Schnitt's case presents a much more compelling case for a reassessment of congressional intent "in light of changing circumstances around the MSPB." *Id.*

---

[5] The inquiry never occurred as the matter was stayed and appealed and is currently pending certiorari to the Supreme Court.

[6] These factors now address the Defendants' claim that Mr. Schnitt did not offer "plausible allegations explaining why the Board is apparently entirely hamstrung in its abilities". Defs' Memo at 18. Nor should it be ignored that a key component underlying the Court's *Thunder Basin* decision was that the plaintiff's claims were going to be "meaningfully addressed", which is impossible here given the Defendants' constitutional position that strips the MSPB of its independence. 510 U.S. at 215.

11

### i. The President Has Fired a Member of the MSPB Without Cause

For the first time since the CSRA was enacted into law, a President has taken the position that he can remove any and all Members of the MSPB without cause despite Congress' express statutory prohibition against such removals. President Trump has already done so, and upon first examination the D.C. Circuit upheld the action. *See Harris v. Bessent*, 160 F.4th 1235 (D.C. Cir. 2025), *petition for en banc rehearing denied*, 2026 U.S. App. LEXIS 2203 (January 28, 2026), *cert. pending*. Based on *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020), the D.C. Circuit held that Congress cannot restrict the President's ability to remove MSPB Members given that Members wield substantial powers that are both executive in nature and different from the powers that *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), deemed to be merely quasi-legislative or quasi-judicial. *Harris*, 160 F.4d at 1242.

### ii. The President Also Asserts the Right to Fire MSPB Administrative Judges Without Cause

The President has also taken the unprecedented position that he can remove any and all of the Administrative Law Judges who conduct hearings and issue preliminary decisions for independent agencies, including the MSPB, despite Congress' express prohibition of such removals in 5 U.S.C. § 7513(a)[7] and the CSRA's express insulation of the MSPB's employment decisions, including decisions about Administrative Judges, from "approval or supervision of the Office of Personnel Management or the Executive Office of the President." 5 U.S.C. § 1204(j). *See also* Acting Solicitor General Sarah M. Harris to Hon. Charles Grassley, *Multilayer Restrictions on the Removal of Administrative Law Judges* (Feb. 20, 2025), *https://iptp-production.s3.amazonaws.com/media/documents/2025.02.20_*

---

[7] The Federal Circuit held that Section 7513(a) applies to MSPB Administrative Judges in *McIntosh*, 53 F.4th at 640.

*DOJ_letter_re_ALJs.pdf* ("Department of Justice has concluded that the multiple layers of removal restrictions for administrative law judges (ALJs) in 5 U.S.C. § 1202(d) and § 7521(a) violate the Constitution, that the Department will no longer defend them in court, and that the Department has taken that position in ongoing litigation"); Statement of Justice Department Chief of Staff Chad Mizelle, DOJ (Feb. 20, 2025), *https://www.justice.gov/opa/pr/statement-justice-department-chief-staff-chad-mizelle* ("Department of Justice determined that multiple layers of removal restrictions shielding administrative law judges (ALJs) are unconstitutional. Unelected and constitutionally unaccountable ALJs have exercised immense power for far too long. In accordance with Supreme Court precedent, the Department is restoring constitutional accountability so that Executive Branch officials answer to the President and to the people.").[8]

### iii. The President Asserts the Authority to Instruct the MSPB and Its Administrative Judges How to Construe and Apply the Law, Including in Specific Pending Cases

Finally, the President has taken the unprecedented position that he has the constitutional authority to direct all members of the Executive Branch, including Members of the MSPB and its Administrative Judges, as to how they must interpret and apply federal law. In Executive Order 14215 (Feb. 18, 2025), *https://public-inspection.federalregister.gov/2025-03063.pdf*, the President declared:

> The President and the Attorney General, subject to the President's supervision and control, shall provide authoritative interpretations of law for the executive branch. The President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties. No employee of the executive branch acting in their official capacity may advance an

---

[8] The President, via the Attorney General's invocation of his Article II authority, has removed at least 98 immigration judges as of December 6, 2025. *See* Emily Ngo, *Immigration courts thrown into chaos as Trump administration purges dozens of judges*, POLITICO (Dec. 6, 2025), *https://www.politico.com/news/2025/12/06/trump-immigration-court-judge-purges-00679376?utm_medium=twitter&utm_source=dlvr.it*.

interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law.

*Id.* §7. The Order is expressly applicable to agencies such as the MSPB. *See id.* §§1, 2(b), 5.

In furtherance of this view, the President, through Defendant DOJ's Office of Legal Counsel ("OLC"), has already informed MSPB judges that they must follow the President's construction of the law and directed judges in specific cases to do so. For example, on September 26, 2025, OLC issued a Memorandum Opinion addressing "The Merit Systems Protection Board's Authority to Adjudicate Constitutional Questions within an Administrative Proceeding," *https://www.justice.gov/olc/media/1415466/dl* ("OLC Opinion"). Whether the MSPB has authority to adjudicate constitutional questions is a contested issue in a number of cases pending before the MSPB, including an appeal filed for preservation purposes by Mr. Schnitt, and agencies are taking the position that the President and Department heads who invoked the President's authority under Article II have the uncontestable right to terminate employees without cause or any due process. And without any room for judicial review.[9]

The OLC Opinion, which completely reversed earlier positions taken by Defendant DOJ, concluded that "MSPB administrative judges must adjudicate the constitutional issued raised by the Agencies." *Id.* at 12. Defendant DOJ immediately conveyed that direction to the Board and its Administrative Judges by filing the OLC Opinion in multiple MSPB cases addressing the

---

[9] As this Opposition was being drafted, Defendant DOJ's OLC issued yet another Memorandum to the President on April 1, 2026, But this one is no joke. It declares the Presidential Records Act of 1978 to be unconstitutional because "congressional attempts to regulate the Presidency directly raise heightened separation of powers concerns." "Constitutionality of the Presidential Records Act (April 1, 2026) at 1, at *https://www.justice.gov/olc/media/1434131/dl?inline*. Given Congress' complete abdication to hold this Administration accountable, it is becoming more and more obvious that absent judicial checks and balances against Executive over-reach there will soon no longer be three equal branches of government.

14

Article II issue and arguing it was binding. *Jackler and Jaroch Consolidation v. DOJ et al.*, Docket No. CF-0752-26-0069-I-1 at ¶12 (March 20, 2026).

Thus, the President is taking the position that not only can he fire Members of the MSPB, but he can also instruct the Board Members and all Administrative Judges how to interpret and apply the law, including in specific pending cases, and then fire them without cause if they disobey (or for any reason whatsoever). A more thoroughgoing rejection of the fundamental premise of the remedial scheme created by Congress in the CSRA – the independence of the MSPB – is hard to imagine.

iv.  *The Defendants Have Asserted That The CSRA Due Process Procedures Are Unconstitutional If The MSPB Can Challenge The President Disregarding Them*

Mr. Schnitt factually asserted in his Complaint, which is obviously taken as true for purposes of this Motion, that "the Defendants have taken the position that the MSPB has no jurisdiction over what the Defendants characterize as an 'Article II removal'." Complaint, at ¶43. In its Motion, however, the Defendants challenge that assertion by claiming "DOJ has taken the position that the MSPB does have jurisdiction over Article II removals, and the MSPB's administrative judges must consider the agency's constitutional defenses to the removals." Defs' Memo at 14.

Except, on February 6, 2026, the Office of Personnel Management published a final rule in the Federal Register entitled *Improving Performance, Accountability and Responsiveness in the Civil Service*, RIN: 3206-AO80, 91 Fed. Reg. 5,580 (Feb. 6, 2026), at *https://www.federalregister.gov/documents/2026/02/06/2026-02375/improving-performance-accountability-and-responsiveness-in-the-civil-service*. This new rule, the section of which is headlined "Construing CSRA To Forbid Schedule Policy/Career Would Create Serious Constitutional Concerns" makes the Defendants' position crystal clear:

> The MSPB employs dozens of administrative judges to hear adverse action appeals. ... MSPB AJs exercise substantial administrative authority because they decide whether to uphold or reverse employee removals, demotions, and long-term suspensions across the executive branch. *If the CSRA is construed to prevent the President from waiving their adverse action procedures, then ... chapter 75 cannot be constitutionally applied to MSPB administrative judges.*

*Id.* at 5,635 (footnote omitted)(emphasis added).

This confirms Mr. Schnitt's contention that the President now takes the position that Article II terminations that are implemented without any due process procedures are unreviewable by the MSPB as violating the separation of powers and unconstitutional.[10] MSPB Administrative Judges are obliged to follow this legal interpretation and if they do not, they can be fired themselves. There is no road to the MSPB any longer.

### C. This Case Involves a Direct Assertion of Presidential Power To Fire Employees While At the Same Time Complete Control of the MSPB Has Been Seized

The Trump Administration's actions that have deprived the MSPB of all independence is particularly problematic because it advances a novel assertion of Article II authority – which is being implemented by the Defendants – to fire federal employees, including Mr. Schnitt, without cause or due process.[11]

---

[10] It is also consistent with the Fourth Circuit's ruling in *Owen* where it notably highlighted that "in lawsuits challenging the removals of the Special Counsel and members of the MSPB, the Government has argued that the removal protections enshrined in the CSRA are violations of separation of powers," *Owen*, 139 F.4th at 307 (citing cases), "thereby calling into question the constitutionality of a critical aspect of the CSRA, and the continued vitality of the statute's adjudicatory scheme." *Id*.

[11] The irony should not be lost on the Defendants cautioning this Court that Mr. Schnitt's arguments "raise grave separation-of-powers concerns" because [j]urisdiction-channeling is a question of congressional intent, and federal courts must exercise great caution before exercising jurisdiction in areas where Congress has chosen to foreclose district-court review, whether by implication or otherwise." Defs' Memo at 17-18. The very reason why this litigation became necessary in the first place was because the Executive Branch Defendants have completely disregarded congressional intent that a federal employee like Mr. Schnitt must be afforded due process as required by statute and regulation before being terminated.

Mr. Schnitt's notice of termination states simply "Pursuant to Article Il of the United States Constitution and the laws of the United States and based on your publicly inappropriate comments that were detrimental to the interests of the Department, your employment with the Department of Justice is hereby terminated, and you are removed from federal service effective immediately." Complaint, at ¶28. Although the notice of termination was signed by Defendant Bondi, it is derived from the President's exercise of his inherent Article II authority. *Id*. at ¶29. Under the current circumstances, a congressional intent to displace general federal question jurisdiction is no longer "fairly discernible in the statutory scheme" at least as to adverse actions directed by the President or his Department heads in invoking Article II authority.

Therefore, this Court should respectfully retain jurisdiction.

### D. Resort to the MSPB Would Be Futile For Mr. Schnitt

Retention of jurisdiction by this Court is not only justified by a renewed interpretation of Step One of the *Thunder Basin* analysis but by traditional futility doctrine as well. Of course, the Supreme Court "has consistently recognized a futility exception to exhaustion requirements." *Carr v. Saul*, 593 U.S. 83-84, 141 (2021). "It makes little sense to require litigants to present claims to adjudicators who are powerless to grant the relief requested." *Id*. at 83, 93. That is the case here, where the Defendants have directed Mr. Schnitt's termination pursuant to Article II authority and where this Administration has made it clear that the MSPB is powerless to do anything about it.[12]

---

[12] The MSPB Board has recently declined to exercise jurisdiction over the Article II terminations of two Immigration Judges (principal officers) because requiring the Administration to provide due process "would unconstitutionally infringe upon the President's ability to faithfully execute the laws." *Jackler and Jaroch Consolidation v. DOJ et al.*, Docket No. CF-0752-26-0069-I-1 at ¶30 (March 20, 2026). An appeal has been filed.

"Resort to the administrative process is futile if the agency will almost certainly deny any relief." *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986). Thus, it should not be surprising that in *McCarthy* the Supreme Court concluded that, "in view of [the] Attorney General's submission that the challenged rules of the prison were 'validly and correctly applied to petitioner,' requiring administrative review through a process culminating with the Attorney General 'would be to demand a futile act.'" *McCarthy*, 503 U.S. at 148, *quoting Houghton v. Shafer*, 392 U.S. 639, 640 (1968). Here, the Defendants assert they have the authority to terminate Mr. Schnitt without cause or due process using the President's Article II authority. To require him to resort to a process in which the President can both dictate the outcome and remove the decision-makers if they dare disagree, is the very definition of a futile act.

### E.  Defendants' Arguments to the Contrary Are Unavailing

Nothing in the decisions cited by Defendants, all of which either preceded the unusual and unique changes described above, contradicts Mr. Schnitt's analysis. While Defendants rely on the Supreme Court's decisions in *Elgin* and *Fausto*, both of those decisions repeatedly emphasize the detailed process created by Congress as explained above. The Court pointed to the "comprehensive nature of the CSRA," that the Act "prescribes in great detail the protections and remedies applicable to adverse personnel actions," that the Act "exhaustively details the system of review before the MSPB," the "CSRA's structure," the "painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions," and the fact that the CSRA created an "integrated scheme of administrative and judicial review." *Elgin*, 567 U.S. 10-13; *Fausto*, 484 U.S. at 443, 445, 448. But critical "detail[s]" of the "comprehensive system" have now been unilaterally eliminated by the President and the Defendants. *Fausto*, 484 U.S. at 443; *Elgin*, 567 U.S. at 5.

It is reasonable to argue that those decisions would not have been the same if the Court had been aware that a central element of the "comprehensive" and "integrated" scheme of review Congress believed it was creating – the independence of the MSPB – was no longer in place. Indeed, one of the two "structural elements" of the Act that the Court found "important" in *Fausto* was "the primacy of the MSPB." *Id*. 484 U.S. at 449. That "primacy" no longer exists after the President removed a Member without cause and instructed the Board and its Administrative Judges that they are bound to follow his construction of the law. And, correspondingly, Congress' intention to "enable[] the development, through the MSPB, of a unitary and consistent Executive Branch position on matters involving personnel action" has been equally frustrated by the President's assertion of authority over the development of the law. The logic of both *Elgin* and *Fausto* would seemingly demonstrate that Congress would not have intended to preclude federal court jurisdiction under the current facts.

The Defendants other relied upon cases similarly have no impact on Mr. Schnitt's arguments as they all predated the events that have upended the entire system since January 20, 2025: *Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551 (D.C. Cir. 2023); *Am. Fed. of Gov't Emps. v. Trump*, 929 F.3d 748 (D.C. Cir. 2019); *Grosdidier v. Chairman, Broad Bd. of Governors*, 560 F.3d 495 (D.C. Cir. 2009); *Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005).

Therefore, this Court should respectfully exercise jurisdiction and adjudicate the merits of this dispute.

## II. APPLICATION OF THE SECOND PRONG OF THE *THUNDER BASIN* TEST REQUIRES THIS COURT TO RETAIN JURISDICTION

Even if consideration of the first step was not dispositive to retaining jurisdiction, the second step of the *Thunder Basin* test independently justifies the exercise of jurisdiction. Normally, three considerations would come into play. First, would "precluding district court jurisdiction

19

'foreclose all meaningful judicial review' of the claim"? *Axon*, 598 U.S. at 185, *quoting Thunder Basin*, 510 U.S. at 212-13. Second, "is the claim 'wholly collateral to [the] statute's review provisions'"? *Id*. (alteration in original), *quoting Thunder Basin*, 510 U.S. at 212. Third, "is the claim 'outside of the agency's expertise'"? *Axon*, 598 U.S. 185, *quoting Thunder Basin*, 510 U.S. at 212.

Given that the Defendants make the unprecedented claim that the CSRA is unconstitutional as applied to the President and his Department heads when asserting Article II authority and no court can tell them otherwise, these circumstances cannot logically favor channeling following consideration of *Thunder Basin*'s second steps.[13]

### A. Congress Did Not Intend Broad, Structural, Constitutional Challenges to the MSPB's Organic Statute to Be Reviewed by the MSPB

In *Thunder Basin* itself, the Court reaffirmed long-standing precedent holding that "[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies." *Id*. at 215. And that is exactly what is at issue here. Defendants argue that the CSRA is unconstitutional as applied to any personnel action taken by the President or his Department heads pursuant to the President's Article II authority. The MSPB cannot, per the Defendants, override Mr. Schnitt's termination decision. In effect, the MSPB is as unavailable and inoperative for Mr. Wright as it was for everyone during the government shutdown last year. As noted in *AFGE*, 2025 U.S. Dist. LEXIS 220612, *18 (D.D.C. Nov. 7, 2025), "some judges in this District have held that the CSRA does not preclude

---

[13] As this Court observed in *AFGE*, 2025 U.S. Dist. LEXIS 220612, *18 (D.D.C. Nov. 7, 2025), the Supreme Court warned that a "serious constitutional question" would arise "if an agency statute were construed to preclude all judicial review of a constitutional claim." *Thunder Basin*, 510 U.S. at 215 n.20, *citing Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 n.12 (1986). While the involved action here is not an agency statute created by Congress, the broad assertion of unreviewable Executive action is functionally the equivalent.

judicial review of constitutional claims where application of the CSRA would 'deny any judicial forum for a colorable constitutional claim.'" *Tarquinii v. Del Toro*, U.S. Dist. LEXIS 174016, 2024 WL 4298857, *22 (D.D.C. Sep. 26, 2024)(citation omitted)(collecting cases). Additionally, because Mr. Schnitt is challenging the Defendants' "power to proceed" with his termination at all, *Axon*, 598 U.S. at 192, rather than the substantive rationale underlying his termination, of which there was none, *cf. Elgin*, 567 U.S. at 22, his challenge is collateral to the CSRA review scheme and jurisdiction vests with the District Court. *See Abromowitz*, 803 F.Supp. 3d at 12.

Furthermore, a claim that the CSRA is unconstitutional is not the type of claim Congress intended to be reviewed by the MSPB as the MSPB itself has repeatedly held. *See, e.g.*, *Special Counsel v. Gallagher*, 44 M.S.P.R. 57, 73 (1990)("the Board lacks authority to adjudicate the constitutionality of a statute"); *Malone v. Dep't of Justice,* 14 M.S.P.R. 403, 406 (1983) ("administrative agencies are without authority to determine the constitutionality of statutes").

To be sure, *Thunder Basin*, 510 U.S. at 215, makes clear that the existence of a constitutional question does not always preclude channeling, as does *Elgin*, 567 U.S. at 10. But the Defendants' argument here, as in *Elgin*, is not that the MSPB can adjudicate whether an agency violated the Constitution with respect to a specific personnel action concerning a single employee, or that this situation presents a case in which the MSPB previously considered constitutional claims.[14] Instead, it is whether the MSPB itself would violate the Constitution if it applied the CSRA in

---

[14] *See e.g., Special Counsel v. Jackson*, 119 M.S.P.R. 175, 179 (2013)(arguing agency "violated [employee's] due process and equal protection rights by selectively enforcing the Hatch Act"); *Brooks v. OPM*, 59 M.S.P.R. 207, 209, 215 n.7 (1993)(petitioners challenged agency construction of statute that caused them to be "denied military service credit for reduction-in-force (RIF) retention purposes and for accrual of annual leave" on the grounds that it deprived them of equal protection"). And, of course, *Elgin*, 567 U.S. at 6-8, also involved a constitutional challenge to discrete actions taken by an agency employer, *i.e.*, firing employees for failure to register for the draft (and the Court did not hold that the MSPB could or should address the argument).

any way to compel the President or a Department head invoking the President's Article II authority to provide due process protections. That is a broad challenge to the MSPB's own organic statute and raison d'être. The government argues that the MSPB is without authority under the Constitution to deem unlawful any adverse action taken by the President or any Department head invoking the President's Article II authority against any employee. This is a novel, structural, constitutional challenge to Congress' authority to constrain the President. The Supreme Court has made clear that "agency adjudications are generally ill suited to address structural constitutional challenges." *Carr*, 593 U.S. at 92.

Our District Court has recognized that new unusual and/or unique circumstances require a different conclusion when applying *Thunder Basin* and that the definitive, non-flexible conclusion painted by the Defendants is not necessarily as settled as they would have one believe. *See Jarkesy v. SEC*, 803 F.3d 9, 17 (D.C. Cir. 2015)(describing *Thunder Basin* factors as "general guideposts useful for channeling the inquiry into whether the particular claims at issue fall outside an overarching congressional design"). The Honorable Royce Lamberth recently rejected similar arguments posed by the Defendants as part of the purge of employees (not under Article II authority) at the U.S. Agency for Global Media:

> When the *Thunder Basin* factors "point in different directions," the "ultimate question is ... whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id*. at 186. Here, the fact that the CSRA scheme might not entirely foreclose judicial review is of less consequence to the Court's analysis than the plain fact that the MSPB has no comparative advantage when it comes to the separation of powers issue at the heart of this dispute. *See id*. at 186 (explaining that factors two and three "give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to"). The Court has jurisdiction.

*Abromowitz*, 801 F.Supp.3d at 13. Judge Lamberth also recognized that recent circumstances are different now so that jurisdiction should remain with the District Court when he noted the

22

"MSPB has no 'special' knowledge 'about the separation of powers' questions that undergird" the dispute created by the Defendants. *Id.*, *quoting Axon*, 598 U.S. *at 194.* This very Court, in examining the impact of the federal shutdown which effectively prevented federal employees from pursuing administrative remedies (which for all practical purposes duplicates the unusual and unique impact of the current MSPB situation), similarly ruled after examining the *Thunder Basin* factors that federal employees were "not required to pass through the relevant administrative review channels before coming to federal court." *AFGE*, 2025 U.S. Dist. LEXIS 220612, *9 (D.D.C. Nov. 7, 2025).

This rationales expressed by this Court and Judge Lamberth make perfect sense because "Congress rarely allows claims about agency action to escape effective judicial review." *Axon*, 598 U.S. at 186. *See also Bowen*, 476 U.S. at 670 n.12 (recognizing "strong presumption that Congress intends judicial review of administrative action"). Under normal circumstances pre-January 20, 2025, the CSRA may have allowed the MSPB to provide "meaningful judicial review" of Mr. Schnitt's constitutional claims after the prescribed agency review process, but those administrative channels have been destroyed by the Defendants and are now foreclosed. *See Lucas v. Am. Fed'n of Gov't Employees*, 151 F.4th 370, 387 (D.C. Cir. 2025)(describing first *Thunder Basin* factor as "all but dispositive" when plaintiff would "have no meaningful opportunity for judicial review" unless they could proceed in federal court).

### B. *Free Enterprise Fund* Is Controlling And Also Permits Jurisdiction

The Supreme Court's decision in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), should also be viewed as controlling here. When a plaintiff objected to the Oversight Board's application of the law given the statutory insulation of Board members from removal, the Court observed that the challenge was "to the Board's existence, not to any of its auditing standards." *Id*. at 490. Similarly, the Defendants in this

23

matter have objected to the MSPB's ability to challenge the President's decision to forgo due process, not to any of its constructions of the law. The Defendants thus raise "a 'standard' issue of ... constitutional law, relating not at all to 'considerations of [MSPB] policy" and "'outside the [MSPB's] competence and expertise.'" *Axon*, 598 U.S. at 188, *quoting Free Enterprise Fund*, 561 U.S. at 491. *See also Abromowitz*, 803 F.Supp. 3d at 12 (jurisdiction permitted because challenge was to Defendants' "power to proceed" with termination not substantive rationale underlying decision).

The Supreme Court's holding and reasoning in *Axon* only amplifies the applicability of *Free Enterprise Fund*. In *Axon*, the Court expressly posed the question as "whether the cases before us are more like *Thunder Basin* and *Elgin* or more like *Free Enterprise Fund*." 598 U.S. at 189. In reasoning that is directly on point here, the Court explained that the case was more like *Free Enterprise Fund* because the challenges "are not to any specific substantive decision .... [Rather the plaintiffs] charge that an agency is wielding authority unconstitutionally in all *or a broad swath of its work*." *Id*. (emphasis added). Just as in *Axon* and *Free Enterprise Fund*, the argument here is that the MSPB would "wield[] authority unconstitutionally in ... a broad swath of its work" if it applies the CSRA protections to any employment decisions made or directed by the President or those Department heads invoking his Article II authority. This is not the form of discrete, specific, or as-applied constitutional argument advanced by an employee with respect to an agency's action that the MSPB must address in the first instance.

The fact that the Trump Administration's arguments would effectively render the CSRA a nullity is made clear by the fact that the President and his various Department heads have not limited their argument to inferior officers, Senior Executive Service ("SES") employees, or other

24

high-ranking employees.[15] Rather, the Administration has asserted its alleged Article II authority to fire any and all employees of any rank. *See e.g.*, Sarah N. Lynch & Andrew Goudsward, *US Justice Department Fires Several More Employees From Jack Smith's Team, Sources Say*, REUTERS (July 14, 2025) at *https://tinyurl.com/2fp8k9k6*. In other words, while the Defendants might not have yet argued that the CSRA is outright unconstitutional in its entirety, they do argue that it cannot constitutionally be applied to any adverse actions directed by the President or his Department heads when they invoke Article II authority, thus effectively allowing the Executive Branch to do an end run around the Act under those circumstances. *See* 91 Fed. Reg. 5,580, 5636 ("construing the CSRA to prevent the President from waiving the application of subchapter II to policy-influencing positions would create serious constitutional challenges.").

Addressing the Defendants' argument that they can violate the CSRA so long as the President or a Department head wishes to do so would require the Board "to question its own statutory authority" and "to disregard ... instructions Congress has given it." *Riggin v. Off. of Senate Fair Emp. Pracs.*, 61 F.3d 1563, 1569–70 (Fed. Cir. 1995). And "[a] finding that the agency lacks jurisdiction to decide constitutional questions is especially likely when the constitutional claim asks the agency to act contrary to its statutory charter." *Id*. at 1569.

---

[15] Not addressed in the Defendants' Motion, and which would have previously influenced this debate, is whether Mr. Schnitt is viewed as an "inferior officer" under the Appointments Clause or as a non-officer federal "employee". That said, the new legal position articulated by this Administration apparently signifies the distinction is without a difference. *See* Fed. Reg. 5,580, 5636 ("If the CSRA is construed to prevent the President from holding senior employees with policy-making or policy-determining responsibilities accountable, then the 'chain of dependence' between government policy and the people would be broken, and the President would not be fully responsible for the executive power wielded in his name.").

Therefore, this Court should respectfully retain jurisdiction after applying step two under *Thunder Basin*.[16]

### III. FORCING MR. SCHNITT TO PROCEED BEFORE THE MSPB WOULD SUBJECT HIM TO A "HERE AND NOW INQUIRY" UNDER *AXON*

Not only are the Defendants wrong as to the outcome that should occur when the *Thunder Basin* test is applied to the current unusual and unique circumstances, but forcing Mr. Schnitt to proceed before the MSPB would also inflict a "here and now injury" under *Axon*. Indeed, this case is the precise mirror image of *Axon* with the only difference being that the administrative tribunal's current procedures violate Article I and not Article II. In *Axon*, plaintiffs sought to have a district court enjoin actions pending before Administrative Law Judges under the Securities and Exchange and Federal Trade Commission Acts on the grounds that those agencies were unconstitutional in structure. As here, the Defendants argued that the plaintiffs could only make those arguments before the agency and then in court but only as part of an appellate review of final agency action. The Supreme Court rejected the channeling argument.

The Court found that later review of agency action by a court of appeal was insufficient because the plaintiffs would already have been harmed by "'being subjected' to 'unconstitutional agency authority.'" *Axon*, 598 U.S. at 191. That, the Court found, "is 'a here-and-now injury .... impossible to remedy once the proceeding is over, which is when appellate review kicks in.'" *Id*.

---

[16] As explained above, this Court need not address the question of judicial review in order to retain jurisdiction under either step one or two of *Thunder Basin*. The Court observed in its discussion of step two that it had "previously ... upheld district court jurisdiction over claims considered "wholly 'collateral'" to a statute's review provisions and outside the agency's expertise, . . . *particularly* where a finding of preclusion could foreclose all meaningful judicial review." 510 U.S. at 212-13 (emphasis added). "[P]articularly" most certainly does not mean "only." *See Abromowitz*, 803 F.Supp. 3d at 12. Moreover, here, while review in the Federal Circuit would be available after an adverse decision by the MSPB, that review would not be "meaningful" because of the deference the court would owe the now not independent agency as the agency's findings of fact – if there even were any – would be subject to a deferential "substantial evidence" standard under 5 U.S.C. § 7703(c)(3).

The relief advocated for by the Defendants here is precisely what the Court concluded in *Axon* could not be done, i.e., forcing Mr. Schnitt to pursue "an illegitimate proceeding, led by an illegitimate decisionmaker." *Id. See also Nicholas Serv. LLC et al. v. DOL*, 2026 U.S. Dist. LEXIS 69349, *17-18 (N.D.Miss. Mar. 31, 2026)(maintaining jurisdiction as later review would be meaningless).

The only difference between this case and *Axon* is in the manner in which the agencies' procedures violate the separation of powers. In *Axon*, the Court found that the congressional statutes that created the agencies infringed on the President's authority under Article II. In the instant matter, the President's removal of a Member of the MSPB, the threat to remove MSPB Administrative Judges, the assertion that the Defendants can instruct both Members and Administrative Judges how to construe and apply the law in particular cases, as well as the argument that the CSRA is unconstitutional if the President is required to provide due process to individuals such as Mr. Schnitt, conversely invades Congress' authority under Article I.[17] But the holding in *Axon* still controls. Mr. Schnitt cannot be forced to submit to "unconstitutional agency authority" particularly because later appellate judicial review will not sufficiently remedy the harm inflicted upon him.

---

[17] While the Supreme Court is currently considering whether the President can remove a Federal Trade Commissioner without cause despite the existence of due process protections in *Trump v. Slaughter*, No. 25-332 (argued December 8, 2025), until such time it rules otherwise *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), remains the law. Even if *Humphrey's* is overturned it is not at all clear whether the decision will impact the MSPB or this dispute. With that said, a reasonable interpretation of the oral arguments proffered by the Solicitor General is that the MSPB and any restrictions imposed on the authority of the President or his Department heads to terminate federal personnel at will, i.e., without any due process, is absolutely on the table for this Administration. *See* Transcript of Proceedings at 3-72 (December 8, 2025), at *https://www.supremecourt.gov/oral_arguments/argument_transcripts/2025/25-332_7lhn.pdf.*

**IV. THIS COURT MUST RETAIN JURISDICTION OVER MR. SCHNITT'S LIBERTY INTEREST CLAIM**

Even if this Court determines that it may not retain jurisdiction over all of Mr. Schnitt's claims, it must retain jurisdiction over his claim that Defendants deprived him of liberty without due process. Regardless of whether Mr. Schnitt was protected by the CSRA and whether he has a right to appeal his termination to the MSPB, (1) he undeniably had a Fifth Amendment liberty interest that could not be infringed without due process, (2) that liberty interest was infringed, (3) he was not and has not been accorded any form of hearing, and (4) his liberty interest claim is not cognizable by the MSPB. Although the Defendants generally addressed Mr. Schnitt's constitutional claims in its opening brief, it offered nothing specific as to his claim that his Fifth Amendment rights were violated.

**A. Mr. Schnitt Possesses A Viable Fifth Amendment Liberty Interest Claim**

In *Board of Regents v. Roth*, 408 U.S. 564 (1972), the Court made clear that when a public employer conveys charges against an employee related to the termination of the individual's employment that "might seriously damage his standing and associations in his community," for example, "that he had been guilty of dishonesty, or immorality[,] .... notice and an opportunity to be heard are essential." *Id*. at 573. "In such a case, due process would accord an opportunity to refute the charge." *Id*.

Publicly stigmatizing remarks were made about Mr. Schnitt in relation to his termination. The Complaint alleges that Defendant DOJ issued a public statement that was widely distributed online, including on James O'Keefe's X (formerly Twitter) account at *https://x.com/OKeefeMedia/status/1963640149335540028*. Complaint, at ¶25. The statement read:

28



*Id.* Defendant DOJ amplified the embarrassment on September 4, 2025, without consulting with

Mr. Schnitt or obtaining his consent, when it posted to its official spokesperson's account on X

(@DOJSpox47) the internal message Mr. Schnitt had sent to his supervisor with no additional

information or context. *Id.* at ¶27. *Id.* This, too, received wide public dissemination, including

that Mr. Schnitt had been fired.[18]

Defendant DOJ's public statement "implies the existence of serious character defects such as

dishonesty or immorality," and are the "type of communication that gives rise to a protected

liberty interest." *Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982). The stigmatizing

public statements by federal officials implicated Mr. Schnitt's liberty interests and entitle him to

a name-clearing hearing. "[C]ourts have uniformly held "that this opportunity to be heard 'must

be granted at a meaningful time.' ... This is because … 'an opportunity to clear your name after it

---

[18] *See e.g.,* "DOJ responds to official's Epstein comments in hidden-camera," Fox8, September 5, 2025, at video*https://myfox8.com/news/doj-responds-to-officials-epstein-comments-in-hidden-camera-video/*; "DOJ Posts Embarrassing Apology Over Official Caught in Honeypot Trap," Daily Beast, September 5, 2025, at *https://www.thedailybeast.com/doj-posts-embarrassing-apology-over-official-caught-in-honeypot-trap/*; "DOJ Responds to Secret Tape of Official Detailing Epstein Files Plan," The New Republic, September 4, 2025, at *https://newrepublic.com/post/200027/justice-department-official-project-veritas-o-keefe-epstein-files-video*; "DoJ Official Makes Epstein Cover-Up Claims in Hinge Date Honey Trap," Newsweek, September 4, 2025, at *https://www.newsweek.com/doj-official-makes-epstein-claims-hinge-date-honeypot-trap-2125013*; "DOJ official says comments on Epstein caught on hidden camera were just 'personal comments'," MSNOW, September 4, 2025, at *https://www.ms.now/top-stories/latest/epstein-files-redaction-hidden-camera-doj-rcna229348*.

has been ruined by dissemination of false, stigmatizing charges is not 'meaningful.'" *Cannon v. Village of Bald Head Island*, 891 F.3d 489 (4th Cir. 2018)(internal citations omitted), *quoting Sciolino v. City of Newport News*, 480 F.3d 642, 653 (4th Cir. 2007)). "[T]he Fourteenth Amendment required Defendants to afford the [employees] a constitutionally adequate name-clearing hearing before publicly disclosing false information regarding the basis for the [employees'] termination." *Cannon*, 891 F.3d. at 506.

Mr. Schnitt was not accorded any form of name-clearing hearing before or after the stigmatizing statements were made. Complaint, at ¶59. He has thus been deprived of liberty without due process since his date of termination, and the deprivation continues day-to-day, exacerbating his injuries. *See Lyons v. Barrett*, 851 F.2d 406, 411 (D.C. Cir. 1988)("By its very nature, a name-clearing hearing is something that loses value the longer it is delayed.").

## B. Application of the Second Prong of the *Thunder Basin* Test Requires This Court to Retain Jurisdiction Over Mr. Schnitt's Liberty Interest Claim

Before applying the second prong of *Thunder Basin* to Mr. Schnitt's liberty interest claim, it may be helpful for the Court to consider what would happen if he attempted to pursue this claim before the MSPB. At the MSPB, the sole issue would be whether Article II gave the Defendants authority to fire Mr. Schnitt without just cause, notice, or any due process. If Mr. Schnitt prevails on that issue, it would be because the Defendants did not accord him the procedural rights he was entitled to under the CSRA. The Board would not and could not address Mr. Schnitt's liberty interest claim. The Board would not and could not grant Mr. Schnitt a name-clearing hearing because the stigmatization caused by Defendant DOJ's statements is not relevant to whether his termination violated the CSRA. The Board would not and could not assess the damage to Mr. Schnitt's reputation caused by the stigmatizing statements because such damage is not relevant to the legality of his termination under the CSRA. The Board would not

30

and could not grant Mr. Schnitt the form of compensatory damages he is entitled to based on the damage to his reputation due to the deprivation of liberty because the Board lacks authority to award compensatory damages in this situation. *Wilson v. Off. of Pers. Mgmt.*, No. DC-0831-13-0423-P-1, 2015 WL 502974 (M.S.P.B. Feb. 6, 2015)("[C]onsequential damages are only awarded where the Board orders corrective action in a whistleblower appeal or a Special Counsel complaint, and compensatory damages are only awarded based on a finding of unlawful intentional discrimination or a violation under the Whistleblower Protection Enhancement Act of 2012."). For these reasons, Mr. Schnitt could not bring his liberty interest claim before the MSPB and his only available avenue for meaningful review is this Court.

After considering each of the factors identified by the *Thunder Basin* at step two, this Court should respectfully conclude that the liberty interest claim is not "of the type Congress intended to be reviewed within this statutory structure." 510 U.S. at 212. First, the absence of district court jurisdiction would "foreclose all meaningful judicial review." *Id*. The MSPB cannot consider the liberty interest claim, order Defendants to provide a name-clearing hearing, or award the forms of compensatory damages necessary to remedy the deprivation of liberty at issue. The CSRA does not permit either the MSPB or the Federal Circuit to award compensatory damages of the type needed to remedy a deprivation of liberty. And *Thunder Basin* recognized that channeling is not required when the plaintiff makes "a colorable showing that full post deprivation relief could not be obtained." *Id*. at 213, *quoting Mathews v. Eldridge*, 424 U.S. 319, 331 (1976)). Absent jurisdiction in this Court on the liberty interest claim, Mr. Schnitt has "no other means, within his control ... to protect and enforce his rights." *Id*., *quoting Leedom v. Kyne*, 358 U.S. 184, 190 (1958).

31

It should not suffice that the Defendants argue Mr. Schnitt can raise his liberty claim (or any viable claim) on appeal to the Federal Circuit. Defs' Memo at 18. The Federal Circuit – unlike this District Court – is not in a position, nor was designed, to adjudicate disputes such as this in the first instance where absolutely no fact finding has been developed. While it is obviously an Article III court that can hear constitutional disputes, it is also obviously an appellate body. It would have normally been the place for the MSPB to render factual determinations which could then have been brought forward on appeal to the Federal Circuit. Without the MSPB in play, the Federal Circuit is effectively neutralized. Courts can only address issues adjudicated by the agency under the CSRA and the agency will not and cannot address the liberty interest claim (even if Mr. Schnitt would prevail on his CSRA claims of lack of due process).

This situation is thus different from that in *Elgin* where the employees challenged their discharge and the Supreme Court held that the challenge had to be brought before the MSPB even if the Board could not consider the employees' argument that the discharge for failure to register for the draft was unlawful because the Selective Service law was unconstitutional, reasoning that the Federal Circuit could address the argument on appeal. 567 U.S. at 7, 17. For Mr. Schnitt, his liberty interest claim is not simply another argument as to why his termination was unlawful, it is a separate cause of action that is not cognizable under the CSRA and cannot result in overturning the action.

Second, the liberty interest claim is "wholly 'collateral' to [the CSRA's] review provisions." *Thunder Basin*, 510 U.S. at 212, *quoting Heckler v. Ringer*, 466 U.S. 602, 618 (1984). Only when an employee "seeks relief from an action covered by the [CSRA]," is the employee "required to comply with the prescribed scheme of administrative and judicial

32

review." *Owen*, 139 F.4th at 299. Here, the stigmatizing statements made about Mr. Schnitt were not part of the formal grounds for his termination (at least not in the termination notice) and are not "action[s] covered by the [CSRA]." Rather, the Act created a procedure for "evaluating adverse personnel actions," such as terminations and suspensions. *Id*. at 302. The statements made about Mr. Schnitt were not covered "personnel actions." Under the CSRA, an employee may contest before the MSPB "any action which is appealable to the 'board under any law, rule, or regulation." 5 U.S.C. § 7701(a). No law, rule or regulation makes stigmatizing statements made about an employee outside the formal notice of termination appealable to the MSPB. Defendants argue that Mr. Schnitt "seek[s] to reverse the removal decision[], to return to federal employment, and to receive the compensation [he] would have earned but for the adverse employment action." Defs' Memo at 14, *quoting Elgin*, 567 U.S. at 22. But the liberty interest claim does not seek to and cannot "reverse agency action." *See e.g.*, *Ratliff v. City of Milwaukee*, 795 F.2d 612, 627 n.4 (7th Cir.1986)("If defendants had deprived [plaintiff] of her liberty interest in pursuing her occupation by publicizing false charges of either dishonesty, gross incompetence, or the like, . . . she could not regain her position."). The claim is wholly collateral to the CSRA's review provisions.

Finally, the liberty interest claim is "outside the agency's expertise." *Thunder Basin*, 510 U.S. at 212. This is not a case, as seen in *Thunder Basin*, where the plaintiff's "claims at root require interpretation of the parties' rights and duties under" the agency's organic statute and agency regulations. *Id*. at 214. A liberty interest claim cannot result in reinstatement or an award of backpay. The claim requires review of statements made about Mr. Schnitt outside the formal notice of termination, evaluation of those statements under *Roth* and its progeny, and assessment

33

of the damage to reputation caused by such statements. The MSPB lacks expertise in each of those aspects of the evaluation of a liberty interest claim.

The liberty interest claim is not "of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212. Therefore, and especially given that the Defendants did not, other than by passing reference, specifically address the Fifth Amendment Liberty Interest claim, this Court should respectfully retain jurisdiction.

### Conclusion

For the above-stated reasons, this Court should respectfully deny the Defendants' Motion to Dismiss.[19]

Dated:  April 2, 2026

Respectfully submitted,

*/s/ Mark S. Zaid*
Mark S. Zaid, Esq.
D.C. Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Mark S. Zaid, P.C.
1250 Connecticut Ave., N.W.,
Ste. 700
Washington, D.C. 20036
(202) 498-0011
Mark@MarkZaid.com
Brad@MarkZaid.com

*Counsel for Plaintiffs*

---

[19] Mr. Schnitt respectfully reserves the right to further address his separate claims under the Administrative Procedures Act (Fourth and Fifth Causes of Action), *Ultra Vires* (Fourth Cause of Action), Declaratory Judgment Act (Sixth Cause of Action) and for Mandamus (Seventh Cause of Action) as these either impact the merits of the dispute or are otherwise incorporated within the same jurisdictional arguments above.